**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3204
_____

CHERYL HARRIS, Co-Administratrix of the Estate
of Tyan D. Maseth, deceased; DOUGLAS MASETH;
Co-Administrator of the Estate of Ryan D. Maseth,
deceased,

Appellants

v.

KELLOGG BROWN & ROOT SERVICES, INC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court  No. 2-08-cv-00563
District Judge: The Honorable Nora B. Fischer

Argued May 14, 2013

Before: SMITH, FISHER, and CHAGARES, *Circuit
Judges*

(Filed: August 1, 2013)

Patrick K. Cavanaugh
Stephen J. Del Sole
William S. Stickman, IV [ARGUED]
Del Sole Cavanaugh Strotd
200 First Avenue
Suite 300
Pittsburgh, PA  15222
  *Counsel for Appellant*

Raymond B. Biagini
Michelle L. Hylton
Lawrence S. Ebner  [ARGUED]
Kurt J. Hamrock
Shannon G. Konn
Daniel L. Russell, Jr.
William J. Sayers
McKenna, Long & Aldridge
1900 K Street, N.W.
Washington, DC  20006

John R. Dingess
Kari Horner
Dingess, Foster, Luciana, Davidson
& Chleboski
20 Stanwix Street
PNC Center, Third Floor
Pittsburgh, PA  15222

William D. Wickard
K&L Gates
210 Sixth Avenue
Pittsburgh, PA  15222
        *Counsel for Appellee*

_____

OPINION

_____


SMITH, *Circuit Judge.*

This case returns to us for resolution of the "important questions about the scope of the political question doctrine and the Federal Tort Claims Act's 'combatant activities' exception" in suits against defense contractors. We did not have the opportunity to reach these issues when this case was before us previously. *Harris v. Kellogg, Brown & Root Servs., Inc.*, 618 F.3d 398, 399 (3d Cir. 2010). Having jurisdiction now to reach these questions, we will provide a framework that establishes the contours of each of these doctrines. And while explaining the two frameworks can be simple, applying them is complicated by a number of case-by-case factors. Illustrating this is our conclusion that one such crucial factor still needs to be decided before the political-question doctrine aspect of this case can be

resolved: which state's law controls the claims and defenses presented. This, in addition to our conclusion that the combatant-activities exception does not preempt the plaintiffs' claims, requires that we reverse and remand to the District Court for further proceedings.

I

During the Iraq War, the United States military established the Radwaniyah Palace Complex as a base of operations. Staff Sergeant Ryan Maseth was stationed there and assigned to live in the barracks called Legion Security Forces Building 1, a building that predated the war and was known to have significant electrical problems. On January 2, 2008, Staff Sergeant Maseth died by electrocution while taking a shower in his barracks. The shower was electrified by an ungrounded and unbonded water pump.

Staff Sergeant Maseth's estate and his parents sued Kellogg, Brown & Root Services ("KBR"), a military contractor hired to perform certain maintenance services at the barracks. They allege that KBR caused Staff Sergeant Maseth's death by negligently performing its maintenance duties under two contracts with the United States. According to the plaintiffs, these contracts set standards of care for work performed under them, which KBR did not meet because it failed to ground and bond the water pump either when KBR installed it or

4

responded to work orders complaining of electrified water in Staff Sergeant Maseth's barracks.

The merits of the plaintiffs' claims have not yet been resolved. Instead, KBR raises two antecedent challenges through a Rule 12(b)(1) motion to dismiss. First, KBR argues that the District Court should not exercise its proper 28 U.S.C. § 1332 diversity jurisdiction because this case presents a nonjusticiable political question. Second, KBR argues that the plaintiffs' claims are preempted by the federal policy underlying the combatant-activities exception in 28 U.S.C. § 2860(j) to the United States' waiver of sovereign immunity for torts.

The District Court first denied the motion before extensive discovery took place. *Harris v. Kellogg, Brown & Root Servs., Inc.*, 618 F. Supp. 2d 400, 403 (W.D. Pa. 2009). KBR sought review of this denial through an interlocutory appeal under the collateral-order doctrine, which we dismissed for lack of appellate jurisdiction. *Harris*, 618 F.3d at 400, 404. On remand, the District Court ordered discovery on the plaintiffs' claims and KBR's defenses. After discovery was mostly complete, KBR renewed its Rule 12(b)(1) motion to dismiss. This time, the District Court granted the motion, holding that the case was nonjusticiable and—alternatively—that the plaintiffs' claims were preempted by the federal policy embodied in § 2680(j). *Harris v. Kellogg, Brown & Root Servs., Inc.*, 878 F. Supp. 2d 543, 547–58 (W.D. Pa.

5

2012). The plaintiffs appeal the dismissal, and this Court has jurisdiction under 28 U.S.C. § 1291.

## II

Jurisdictional and justiciability questions must be resolved before a court reaches the merits of a case. *Larsen v. Senate of Com. of Pa.*, 152 F.3d 240, 245–46 (3d Cir. 1998); *see also Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("Jurisdiction is vital only if the court proposes to issue a judgment on the merits."). Whether a case contains a political question is a matter of justiciability. *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 376 (3d Cir. 2006). Absent complete preemption, whether a plaintiff's claims are preempted relates to the merits. *See In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999) (explaining that "ordinary preemption" arises only "as a federal defense to a state-law claim"). Neither party argues, and no court has held, that § 2860(j) combatant-activities preemption constitutes complete preemption. Accordingly, we must review the District Court's political-question holding before addressing its preemption holding.[1]

---

[1] The parties do not discuss whether Rule 12(b)(1) was the appropriate vehicle for KBR to assert its § 2680(j) preemption argument. The District Court, however, noted that Rule 56 may have been the appropriate vehicle.

Nevertheless, it analyzed KBR's arguments under Rule 12(b)(1) because the plaintiffs did not dispute its applicability and because the District Court believed that "it can be reasonably inferred from [our prior decision in this case] that Rule 12(b)(1) is the appropriate standard." *Harris*, 878 F. Supp. 2d at 568 & n.17. Although the parties do not dispute the appropriate standard, we must clarify that our prior decision did not imply, as the District Court believed, that Rule 12(b)(1) is the right vehicle for ordinary preemption arguments.

As the District Court acknowledged, our first decision in this case did not address whether Rule 12(b)(1) was the appropriate vehicle in which to advance any of the arguments KBR has made. *Id.* at 568 n.17. Nevertheless, the District Court inferred from our statement that "because the presence or absence of a political question is such a fact-intensive inquiry, a better-developed record could give rise to another colorable motion to dismiss," *Harris*, 618 F.3d at 403, one could reasonably conclude that Rule 12(b)(1) is the appropriate mechanism for making KBR's arguments. Our prior decision's statement is arguably dicta. At all events, it is nothing more than a statement about the appropriate procedural posture for analyzing political-question arguments rather than a statement about the method to review § 2680 preemption arguments.

This narrow reading is necessary because § 2680

## A.     The Political-Question Doctrine

KBR asserts its political-question argument as a factual challenge to the District Court's jurisdiction. *See Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d

---

questions like the one in this case are about *preemption* rather than *sovereign immunity*. To be sure, § 2680 is often invoked under Rule 12(b)(1) because it is an assertion of sovereign immunity by the federal government, which is jurisdictional. *See Smith v. Johns-Manville Corp.*, 795 F.2d 301, 306 n.8 (3d Cir. 1986) ("The discretionary function exception [found in 28 U.S.C. § 2680(a)] operates as a bar to jurisdiction."). KBR, however, does not assert sovereign immunity. Instead, it argues that § 2680(j) represents a federal policy that preempts the plaintiffs' claims. *See Boyle*, 487 U.S. at 508–10. Preemption arguments, other than complete preemption, relate to the merits of the case. *In re U.S. Healthcare, Inc.*, 193 F.3d at 160. Therefore, the appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either Rule 12(b)(6) or for summary judgment, *Fisher v. Halliburton*, 667 F.3d 602, 608–09 (5th Cir. 2012)—as the District Court seemed to intuit.

The plaintiffs have waived any argument related to this error, however, so it is beyond the scope of our review. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

Cir. 2000) ("A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction."). In such a challenge, the burden of proving that jurisdiction exists lies with the plaintiff, and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Furthermore, "no presumptive truthfulness attaches to plaintiff's allegations," and when jurisdiction is intertwined with the merits, "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*.

We exercise plenary review over the District Court's legal conclusions but review its factual findings for clear error. *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008). Here, the plaintiffs challenge both factual findings and legal conclusions. The plaintiffs' factual arguments, however, are without merit because the Court did not make the factual findings they argue that it did.[2] We will thus exercise plenary review over the District

---

[2] The plaintiffs argue that the District Court erroneously found that KBR did not install or work on the pump that caused Staff Sergeant Maseth's death. The District Court made no such findings. Instead, it explained that whether KBR did install or work on the pump could be reasonably disputed by the parties.

Court's legal conclusion that this case presents a nonjusticiable political question.

A case presents a nonjusticiable political question when one of the following characteristics is "inextricable from the case":

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) or a lack of judicially discoverable and manageable standards for resolving it; (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) or an unusual need for unquestioning adherence to a political decision already made; (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). KBR argues that resolving the plaintiffs' claims will require judicial intrusion into issues textually committed to the executive, present issues that lack judicially manageable standards, and express a lack of respect due to coordinate branches

10

of government. Assessing this argument requires a "discriminating inquiry into the precise facts and posture of the particular case," *id.*, in a level of detail and complexity that is rare even in the political-question context.

Often, when the political-question doctrine is asserted, nonjusticiability arises from the possibility that one branch of government has exceeded its powers and the court must decide whether it has the authority and competence to regulate the alleged abuse. *See, e.g.*, *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1430–31 (2012) (holding that determining whether a statute allowing Americans born in Jerusalem to indicate Israel as their place of birth, which was argued to represent a congressional infringement on executive prerogatives, was not a political question). As such, when deciding whether a case presents a political question, we rarely need to look beyond the complaint and any of its obvious implications.

This is not so with complaints against defense contractors. Defense contractors do not have independent constitutional authority and are not coordinate branches of government to which we owe deference. *See Taylor v. Kellogg, Brown & Root Servs., Inc.*, 658 F.3d 402, 409 (4th Cir. 2011) (recognizing that "KBR is not a part of the military"). Consequently, complaints against them for conduct that occurs while they are providing services to the military in a theater of war rarely, if ever, directly

11

implicate a political question. Nonetheless, these suits may present nonjusticiable issues because military decisions that are textually committed to the executive sometimes lie just beneath the surface of the case. For example, a contractor's apparently wrongful conduct may be a direct result of an order from the military, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281–83 (11th Cir. 2009) (holding that a nonjusticiable issue is introduced when contractor-caused harm was a result of following orders from a convoy commander), or a plaintiff's contributory negligence may be directly tied to the wisdom of an earlier military decision, *Taylor*, 658 F.3d at 411–12 (holding that a nonjusticiable issue is introduced when contributory negligence is based on the plaintiff's disregard of an earlier military decision). In these situations, the political question appears not from the plaintiff's claims but from the broader context made relevant by a contractor's defenses. As such, to avoid infringing on other branches' prerogatives in war-time defense-contractor cases, courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiff's claims as well as the defendant's defenses. *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) ("We must look beyond the complaint, considering how the Plaintiffs might prove their claims *and* how KBR would defend.").

1.      Textual Commitment

12

The Fifth and Eleventh Circuits have provided a helpful framework for deciding whether a suit against a defense contractor contains issues textually committed to another branch. Because defense contractors are not coordinate branches of government, a determination must first be made whether the case actually requires evaluation of military decisions. If so, those military decisions must be of the type that are unreviewable because they are textually committed to the executive. *See id.* at 560; *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359–60 (11th Cir. 2007).[3] According to

---

[3] Although the Fourth and Ninth Circuits—the only two circuits to have previously addressed this issue—do not use this framework, their analyses are consistent with it. In *Taylor v. Kellogg, Brown & Root Servs., Inc.*, the Fourth Circuit decided that a marine's negligence claim against KBR was nonjusticiable. 658 F.3d at 404. The marine was electrocuted while installing a second generator to a tank ramp that the military had not authorized. *Id.* Relying heavily on the Fifth and Eleventh Circuits' decisions, the Fourth Circuit held that the case presented a political question because resolving KBR's contributory-negligence defense would require evaluating whether the military was correct to not authorize the second generator installed by the marine—a question "beyond the scope of judicial review." *Id.* at 411–12 & n.13.

KBR, this case would require judicial review of the military's decisions about where to house soldiers on a battlefield—decisions that are unreviewable because they involve strategic calculi about how best to defend against threats. *See McMahon*, 502 F.3d at 1359 ("'The strategy and tactics employed on the battlefield are clearly not subject to judicial review.'" (quoting *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991)). Consequently, the parties have focused on the first element of the framework: whether the plaintiffs' claims can be resolved

---

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), involved a suit against the United States and a defense contractor for shooting down a civilian airliner off the Iranian coast. *Id.* at 1330–31. The Ninth Circuit decided that although the suit involved "conduct [that] took place as part of an authorized military operation," the suit was not barred by the political-question doctrine because the claims were for "judicially cognizable injury" that resulted from "military intrusion into the civilian sector." *Id.* at 1331–31 (quoting *Laird v. Tatum*, 408 U.S. 1, 15–16 (1972)); *see also The Paquete Habana*, 175 U.S. 677 (1900) (reviewing military's seizure of two Spanish fishing vessels during the Spanish-American war). Viewed under the Fifth and Eleventh Circuits' framework, the case was justiciable because the second condition was not met—although the case required evaluation of military decisions, they were the type that is reviewable.

14

without evaluating these military decisions.

Military control over a contractor's actions is one common way that evaluation of strategic military decisions becomes necessary. Military control requires evaluation of military decisions because if the contractor is simply doing what the military ordered it to do, then review of the contractor's actions necessarily includes review of the military order directing the action. *See Carmichael*, 572 F.3d at 1281–83 (holding that a suit for damages arising from a convoy crash included a nonjusticiable issue because of the degree of control the military had over the convoy, such as selection of path, speed, and distance between vehicles). However, where the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions. *See McMahon*, 502 F.3d at 1360–61 (holding that a defense contract for aviation transportation in Afghanistan did not include sufficient military control to introduce a political question because the contractor retained authority over the type of plane, flight path, and safety of the flight).

In this case, the contracts between the military and KBR fit within the latter category. They provide KBR with significant discretion over how to complete authorized work orders. This discretion is best evidenced

by the lack of detailed instructions in the work orders[4] and the lack of military involvement in completing authorized work orders. *See id*. Military control over KBR's relevant activities therefore does not introduce an unreviewable military decision into the case.

Our analysis does not end here however. Plaintiffs' claims might still present unreviewable military decisions if proving those claims or KBR's defenses necessarily requires evaluating such decisions. *See Taylor*, 658 F.3d at 410–12. Accordingly, we must review every claim and defense in the case. Ultimately, whether the claims or defenses introduce a political question depends on which state's law applies. We will thus remand so the District Court may undergo a choice-of-law analysis.

  a)  *The Plaintiffs' Claims*

---

[4] For example, one work order contained the problem complained of—"pipes (shower & sink) have voltage[,] get shocked in shower & sink"—but did not instruct KBR how to solve this problem. J.A. at 2013. KBR marked the project complete but did not explain what it did. J.A. at 2014. And when the military gave directions, those directions were quite minimal. *See* J.A. at 2015 (work order to solve "[w]ater pump leaking on top of bldg thru roof" that directs KBR to fix by "replac[ing] pressure switch").

The plaintiffs' claims center on KBR's failure to ground or bond the water pump when KBR allegedly installed or maintained the pump. As to installation, the plaintiffs allege that if KBR installed the pump, then it was negligent for not grounding or bonding the pump as required by the standard of care set by KBR's contract with the military. As to maintenance of the pump, the plaintiffs allege that (1) KBR had a contractual duty to respond to work orders with safe work, (2) soldiers in Staff Sergeant Maseth's barracks complained of shocks that were reported to KBR in authorized work orders, (3) KBR could have eliminated the risk of electrocution under these work orders, but (4) it was negligent in failing to eliminate or recognize that risk.[5] Although determining the validity of these claims will require acknowledgement of some strategic military decisions, neither theory requires second-guessing the wisdom of those decisions.

---

[5] The plaintiffs did include several other claims in their complaint, which the District Court dismissed because they directly called into question strategic military decisions. *Harris*, 878 F. Supp. 2d at 574. These liability theories were the failure to warn, remedy the risk, rewire the building, provide safe alternatives, and properly maintain the facility. *Id*. We do not understand the plaintiffs to appeal this ruling because their briefs focus solely on the theories explained above.

The installation theory is based on KBR's alleged installation of the pump between March 2006 and February 2007. At that time, KBR was operating under a CENTCOM[6] contract with the U.S. Army Corps of Engineers. This contract acknowledged that "[e]xisting . . . electrical systems are in poor condition" and required KBR only to maintain the systems in their "existing" state. J.A. at 1645. Nonetheless, any completed electrical work was required to "operate as originally intended and designed, and in a safe manner." J.A. at 1644. The parties dispute what "safe manner" means. KBR argues that it is not associated with any particular standard, while the plaintiffs argue that it refers to American and British electrical safety standards. So if the plaintiffs can show that KBR actually installed the pump—a disputed factual question—then whether KBR was negligent depends entirely on the standard of care established by the contract.

To be sure, determining that standard will require a court to interpret the contract, which may require testimony from military officials. But such testimony would do no more than provide information about how to interpret the term "safe manner"; their testimony would not require the fact finder to determine whether the

_____

[6] CENTCOM stands for United States Central Command—the United States' military command in the Middle East.

18

military was negligent in setting the "safe manner" standard in the contract. And once the meaning of "safe manner" is determined, evaluating whether KBR's work complied with that standard is a factual question for the fact finder—a question that, again, does not require evaluating any military decision. The plaintiff's installation theory therefore does not require evaluating any unreviewable military decisions.

The same is true for the plaintiffs' maintenance theory. KBR allegedly performed, or should have performed, maintenance to the pump under a different contract, the LOGCAP[7] III, Statement of Work and Task Order 139. This contract divided buildings located on the base into three categories—Level A, B, or C. KBR was tasked with refurbishing and providing preventative maintenance to Level A buildings. However, for Level B buildings like the one in which Staff Sergeant Maseth was electrocuted, KBR was not to perform preventative maintenance—it was required only to complete maintenance requested through work orders. These work orders were initiated through complaints submitted to on-base field officers, known as "camp mayors," who would

---

[7] LOGCAP—the Logistics Civil Augmentation Program—is a program to "preplan for the use of civilian contractors to perform selected [support] services in wartime to augment Army forces." U.S. Army Regulation 700-137 § 1-1 (1985).

19

review the complaints and submit work orders to KBR if the work was to cost less than a fixed amount. J.A. at 1718. If a work order exceeded KBR's contractual authority, then KBR was to return it to the camp mayor. J.A. at 1718.

According to the plaintiffs' maintenance theory, KBR should have properly grounded and bonded the pump when it responded to one of several work orders. Although none of these work orders requested maintenance on the pump that caused Staff Sergeant Maseth's death, the plaintiffs argue that KBR's completion of other work orders complaining of shocks in the same building is circumstantial evidence that KBR must have (or, at least, should have) performed some maintenance on that water pump.[8]

---

[8] Underlying their argument that KBR *must have* performed this maintenance is a factual dispute over whether KBR *could have* performed such maintenance within the scope of the contract. Resolving this issue depends on whether the maintenance would have required KBR to rewire the entire building or just to ground and bond the water pumps—the former is presumably beyond the cost constraints of the contract while the latter is not. This is a question for the fact finder to resolve through evaluation of the competing experts' testimony.

This theory, like the installation theory, is based solely on whether KBR satisfied its contract duties. The plaintiffs do not, for example, argue that the military should have categorized Staff Sergeant Maseth's barracks as Level A or should have submitted a work order for the pump. They argue only that KBR failed to satisfy the contractual standards for maintaining Level B buildings. The LOGCAP contract's standard of care is currently unresolved—this time because the contract is silent on the question. Interpreting the contract's standard of care will again require applying principles of contract interpretation, and may require some military officers to testify. But just like the installation theory, this interpretive question can be resolved without second-guessing military decisions.

As a result, neither of the plaintiffs' liability theories requires evaluating the wisdom of the military's decisions. Accordingly, neither justifies dismissing this case on political-question grounds.

### b) KBR's Assumption-of-the-Risk Defense

While the plaintiffs' liability theories do not implicate strategic military decisions, KBR asserts three defenses that may: assumption of the risk, proximate cause, and contributory negligence. When analyzing whether a proposed defense implicates a nonjusticiable issue in a Rule 12(b)(1) factual challenge, courts must first decide whether the defendant has "present[ed]

sufficient evidence to permit a jury to conclude that he established the [elements of the] defense by a preponderance of the evidence." *United States v. Stewart*, 185 F.3d 112, 125 (3d Cir. 1999). If there is sufficient evidence to support the defense, then the District Court must determine whether the defense actually presents a nonjusticiable issue. If it does introduce such an issue, then the case is dismissed.[9] But if there is insufficient evidence to support the defense, or if the defense does not present a nonjusticiable issue, then the case goes forward. Applying this framework, we conclude that KBR's assumption-of-the-risk defense is justiciable because that defense does not require evaluating unreviewable military decisions. Yet KBR's contributory negligence and proximate cause defenses may present nonjusticiable issues, depending on which state's law

---

[9] The parties do not dispute that the introduction of a nonjusticiable issue by a defense requires the dismissal of the entire case rather than elimination of the defense. This assumption is also made by several of our sister courts of appeals. *See, e.g.*, *Taylor*, 658 F.3d at 409; *Carmichael*, 572 F.3d at 1292; *Lane*, 529 F.3d at 565. We follow suit and, at least for now, adopt this assumption. But we acknowledge that dismissing the entire case is not the only possible conclusion, as evidenced by the remedy for the introduction of nonjusticiable issues by damages estimates discussed in Part II.A.1.c *infra*.

applies.

The District Court analyzed KBR's assumption-of-the-risk defense under Pennsylvania law.[10] This defense bars any recovery if a defendant can show that the injured party knew of the dangerous condition, which was both obvious and avoidable, yet still voluntarily encountered it. *Kaplan v. Exxon Corp.*, 126 F.3d 221, 226 (3d Cir. 1997) (quoting *Carrender v. Fitterer*, 469

---

[10] The District Court has not yet determined if Pennsylvania, Tennessee, or Texas law applies. *Harris*, 878 F. Supp. 2d at 567. It sensibly restricted its analysis of KBR's assumption-of-the-risk defense to Pennsylvania law because the parties relied on it alone and because this defense is not available under Tennessee and Texas law. *Id.* at 567 & n.32; *see also Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 772 n.34 (Tex. 2010) (explaining that in *Farley v. M.M. Cattle Co.*, 529 S.W.2d 751, 758 (Tex. 1978), the Texas Supreme Court "abolish[ed] implied assumption of the risk but retain[ed] [the] affirmative defense of express assumption of the risk"— the latter of which is when a plaintiff "explicitly consents to take personal responsibility for potential injury-causing risks"); *Baggett v. Bedford Cnty.*, 270 S.W.3d 550, 554 (Tenn. Ct. App. 2008) (explaining that "[t]he Tennessee Supreme Court abolished the defense of implied assumption of risk in [*Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994)]").

23

A.2d 120, 125 (Pa. 1983)). Voluntariness requires that the injured party "had a real 'choice.'" *Id*. (citing *Howell v. Clyde*, 620 A.2d 1107, 1112 (Pa. 1993)). KBR argues that Staff Sergeant Maseth assumed the risk of electrocution because when he took the fatal shower, he was aware of the risks of taking a shower in his barracks but chose to do so despite the military's provision of safe alternative showering facilities. KBR is entitled to present this defense to a jury because it has presented evidence supporting Staff Sergeant Maseth's awareness of and voluntary exposure to the risk of electrocution. Importantly, the voluntariness of his choice to use the shower is evidenced by the availability of alternative showering facilities provided by the military.

The District Court found that analyzing voluntariness would draw strategic military decisions into the case because it would require the plaintiffs "either [to] admit that Maseth voluntarily encountered the risk in the shower, an admission which would undermine their case, or [to] take the position that his actions were involuntary such that he was acting in response to military orders and directly challenge the military's decision concerning the shower facilities which were made available to him at the base." *Harris*, 878 F. Supp 2d at 587. But those are not the only possibilities. The plaintiffs may argue, for instance, that the alternative facilities were not available to Staff Sergeant Maseth or, if they were, that he was not aware of them. If either of

24

these propositions is true, then he could not have avoided the risk under Pennsylvania law. Neither of these arguments implicates strategic military decisions. Whether the military should have provided Staff Sergeant Maseth with alternative showering facilities, as KBR intends to argue, is entirely irrelevant to whether such facilities were available to him and, if they were, whether he was aware of them. Furthermore, although the evidence appears to weigh against them, the plaintiffs may still dispute whether Staff Sergeant Maseth was aware of the risk, which has nothing to do with unreviewable military decisions. KBR's assumption-of-the-risk defense thus does not introduce a nonjusticiable question because the merits of this defense depend solely on facts that do not implicate strategic military decisions.

### c)    KBR's Proximate-Cause Defense

KBR also argues that its proximate-cause defense makes this case nonjusticiable. KBR emphasizes its intent to argue that the military's actions were *the* sole cause of Staff Sergeant Maseth's death. A variation of this defense, which the District Court referred to, is the ability of KBR to argue that the military was *a* proximate cause of the death. The District Court found that both versions of KBR's proximate-cause defense would require evaluating military judgments.

KBR has presented sufficient evidence to support both of these defenses. Under relevant state law, a

defendant can avoid liability by demonstrating that a third party is the true proximate cause of the harm. *Harris*, 796 F. Supp. 2d at 658–60 (collecting cases). KBR has presented sufficient evidence to support its argument that the military, rather than KBR, was the exclusive proximate cause of Staff Sergeant Maseth's death. Under both contracts between KBR and the military, the parties shared responsibility for maintaining buildings in the Radwaniyah Palace Complex. The military retained authority to perform its own maintenance. *See, e.g.*, J.A. at 701 (recording Specialist Michael Skaggs' testimony regarding maintenance work he completed while serving in the complex). Furthermore, the military was ultimately responsible for life support functions at the base—which is exemplified by the military's retention of authority to approve projects before KBR could perform any work and by occasional decisions to ignore KBR's maintenance advice. *See, e.g.*, J.A. at 649 (explaining that Level B facilities were to be maintained only on request); J.A. at 500 (recounting KBR's initial desire to estimate a Level A maintenance cost for the barracks that the military rejected).

This shared responsibility leaves open the possibility that the military alone caused Staff Sergeant Maseth's death. As the District Court explained, KBR could prove that the military is the sole cause if the military (1) installed the pump improperly and never

subsequently grounded or bonded it, (2) performed maintenance on the pump that caused it to be ungrounded and unbonded, (3) never provided KBR the authority to fix it because it was outside of the contract's scope, or (4) never submitted a work order to fix the pump. Any of these possibilities would mean that KBR had no contractual duty to repair the pump. Because KBR has provided sufficient evidence of these possibilities, this defense may go forward.

The plaintiffs argue that the defense that the military was *a* proximate cause is unavailable because the relevant evidence shows only military actions that are outside of the scope of their claims, and whose connection to this case is too attenuated to be a proximate cause. Deciding whether a party is a proximate cause varies slightly between the relevant states. The District Court has determined that Iraqi law does not apply but has not decided if Pennsylvania, Tennessee, or Texas law applies. *Harris*, 878 F. Supp 2d at 567. Starting with Texas law, defendants are the proximate cause of an injury if their conduct was the cause in fact of the harm suffered and if the harm is the foreseeable result of that conduct. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Harm is foreseeable when "the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Id*.

Electrocution was a reasonably foreseeable result of several strategic military decisions. The military was

27

aware that the buildings in the Radwaniyah Palace Complex had substandard electrical systems that posed the specific risk of electrocution in shower facilities. J.A. at 324 (discussing the military's warning to troops about the risks of electrocution from showers in existing buildings); J.A. 431–32 (recording the statement of an Army general explaining that the military was aware of the risks of placing troops in existing buildings); J.A. at 1645 (recognizing in the contract that the electrical systems were in poor condition). Nevertheless, the military chose to assign personnel to live in these barracks because the risk of electrocution was minor compared to the risks from external threats, such as missile and mortar attacks. J.A. at 432. From KBR's perspective, the military foresaw the exact harm suffered by Staff Sergeant Maseth. Indeed, KBR's argument is bolstered by the military's decision to contract with KBR to repair the electrical problems in buildings like Staff Sergeant Maseth's only in response to a work order, even though (1) KBR initially recommended that Staff Sergeant Maseth's barracks be categorized as Level A, (2) KBR informed the military of the barracks' significant electrical problems, J.A. at 500, and (3) the military was aware of shocking in the building from service-member complaints.

KBR argues that the military therefore must have anticipated that electrocutions were a risk of its decision not to categorize the building Level A and not to have

28

KBR repair the building's electrical system. *See* J.A. at 433 (recounting a general's testimony that an event like Staff Sergeant Maseth's death could have occurred in any number of facilities throughout Iraq because of military decisions). Additionally, these decisions establish cause in fact: but for the military's decisions to house troops in dangerous buildings that were not to be repaired, the staff sergeant's death would not have occurred. KBR has therefore presented sufficient evidence to invoke its proximate-cause defense under Texas law.

The same is true under Pennsylvania and Tennessee law. Although the tests are not identical, both states essentially ask whether "(1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm." *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005) (evaluating proximate cause based on these two factors and whether the harm could have been reasonably foreseen are considered in evaluating proximate cause); *see also Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1287 (Pa. Super. Ct. 2005) (evaluating proximate cause based only on these two factors). The second of these elements is essentially the same as the foreseeability analysis under Texas law, *see Wisniewski v. Great Atl. & Pac. Tea Co.*, 323 A.2d

29

744, 748 (Pa. Super. Ct. 1974) (citing *Majors v. Brodhead Hotel*, 205 A.2d 873 (Pa. 1965)), so KBR has adduced sufficient evidence to satisfy this element for the same reasons it can show foreseeability under Texas law.

As to the first element, whether the military's decisions were a "substantial factor" depends on three factors:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]

> (c) lapse of time.

*Lux*, 887 A.2d at 1287. KBR's evidence supports a finding that these factors show that the military was a substantial factor in Staff Sergeant Maseth's death. The first factor, which is based on the Second Restatement of Torts, asks whether there is one event that had such a "predominant effect" that it should foreclose liability for other events that contributed to the harm. Restatement

30

(Second) of Torts § 433 cmt. d. The evidence demonstrates that there are at least two events that contributed to the staff sergeant's death: the military's maintenance decisions despite the known electrical problems and KBR's alleged negligent response to the work orders. Yet even if KBR's negligence caused the harm, it is difficult to see why the negligence is so predominant that it should foreclose any fault that is plausibly attributable to the military for knowingly placing service members in buildings with dangerous electrical systems.

KBR has also presented sufficient evidence on the second and third factors. As to the second factor, the military's decisions were a "continuous and active" force "up to the time of the harm," *Lux*, 887 A.2d at 1287, because they created the environment for the harm to occur and made electrocution likely to occur by using the barracks with substandard electrical wiring. As to the third factor, KBR has shown no "lapse of time," *Lux*, 887 A.2d at 1287, because these military decisions were essentially ongoing, as evidenced by the military's continual inaction regarding a technical inspection report from KBR two months before Staff Sergeant Maseth died. *See* J.A. at 525–27.

All of this is to say that KBR has adduced sufficient evidence to present its defenses that the military's housing and maintenance decisions were at least *a* proximate cause of the death and that they were

*the* proximate cause. Left unanswered, however, is whether either of these defenses present a nonjusticiable issue because they require evaluating unreviewable military decisions.

KBR's defense that the military was the sole cause of Staff Sergeant Maseth's death does not require such an evaluation. As discussed above, KBR can successfully use this defense if it proves any of the following: that the military (rather than KBR) installed or performed faulty maintenance on the pump, that fixing the electrified showers was beyond the scope of KBR's contract, or that no work order was ever submitted that would have required grounding or bonding of the pump or given KBR reason to notice that it should be. Unsurprisingly, several of these possibilities are related to existing factual disputes between the parties. They disagree over whether KBR installed the pump, could have fixed the problem within the scope of the second contract, or responded to work orders that would have required work on the specific pump that caused Staff Sergeant Maseth's death. Resolving these disputes—and thus whether the cause of the death was the sole fault of the military—does not require evaluating military decisions. All of these disputes are simply about who did what, and whether KBR could have performed the work it failed to do under the contract.

To be sure, resolving these disputes will require submission of evidence that the military could have

installed or maintained the pump. Such evidence might include the military's shared responsibility for maintaining life-support systems on the base and its occasional performance of maintenance that contradicted KBR's recommendations. But the submission of evidence related to strategic military decisions that are necessary background facts for resolving a case involving a defense contractor is not sufficient to conclude that a case involves an issue textually committed to the executive. Instead, the case must require *evaluation* of those decisions such that the fact finder is asked to reexamine their wisdom. *See McMahon*, 502 F.3d at 1359–61 (explaining that a claim must require "reexamination" of a military decision before holding that the claim at issue did not implicate the political-question doctrine even though military decisions were relevant to the case). KBR's defense that the military was the sole cause of Staff Sergeant Maseth's death does not require such an evaluation because the disputes are entirely factual: KBR did or did not install or maintain the pump, did or did not have authority under the contract to fix the showers, and did or did not receive a work order that would have required it to fix the pump. The District Court thus erred when it concluded that resolving this defense would require determining whether the military was negligent.

The other variation of KBR's proximate-cause defense—that the military was a proximate cause of Staff

33

Sergeant Maseth's death—is another matter. It may require evaluation of strategic military decisions, and those questions turn on state law. If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor like KBR and the military without evaluating the decisions made by each—particularly, the military's decisions to house troops in unsafe barracks that would not be repaired. *See Fisher v. Halliburton*, 667 F.3d 602, 621–22 (5th Cir. 2012) (explaining that Texas's proportional-liability system could introduce a political question but resolving the case on other grounds).

Tennessee and Texas use proportional-liability systems. *McIntyre v. Balentine*, 833 S.W.2d 52, 56 (Tenn. 1992); Tex Civ. Prac. & Rem. Code § 33.004. So if Tennessee or Texas law applies, then damages cannot be estimated without evaluating unreviewable military decisions.[11] Under Pennsylvania law, however, joint-and-

---

[11] This conclusion depends on the ability of fact finders to assign fault to immune parties, such as the government. Both states permit this. The Tennessee Supreme Court appears to have never dealt with the

several liability would apply. *See* 42 Pa.C.S.A. § 7102(b) (West 2004); Act No. 2011-17, 195th Pa. Gen. Assemb. (2011) (eliminating joint-and-several liability for actions that accrue after the law's enactment).[12] So if Pennsylvania law controls, then calculation of damages does not require evaluating strategic military decisions because the plaintiffs are free to obtain the entirety of

---

assignment of fault to the government but has stated frequently that "a jury may generally apportion fault to immune nonparties." *Carroll v. Whitney*, 29 S.W.3d 14, 19 (Tenn. 2000). The Texas Supreme Court does not appear to have dealt with this question, but one intermediate appellate court has stated that the relevant Texas statute allows assignment of fault to immune nonparties. *In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 56 n.5 (Tex. App. 2005).

[12] The liability rule could differ for other cases governed by Pennsylvania law because the state only recently eliminated joint-and-several liability for many torts. Act No. 2011-17, 195th Pa. Gen. Assemb. § 1 (2011). But this change only "appl[ies] to causes of action which accrue on or after the effective date of this section [June 28, 2011]." *Id.* at § 3. Staff Sergeant Maseth was killed on January 2, 2008. So the causes of action in this case accrued before, rather than "on or after," June 28, 2011. Pennsylvania's old rule of joint-and-several liability would apply.

their relief from KBR. *See Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 488–89 (Pa. 2009).

Whether KBR's proximate-cause defense implicates a nonjusticiable issue thus depends on which state law controls. If the District Court decides that Pennsylvania law applies, then the defense does not introduce any nonjusticiable issues. But if the Court decides that either Tennessee or Texas law applies, then the defense will introduce such an issue. Even if Tennessee or Texas law applies, though, only the fact finder's calculation of damages would be nonjusticiable. This means that we can extract the nonjusticiable issue in a manner that possibly preserves some of the plaintiffs' claims by dismissing only the damages claims that rely on proportional liability. *See Baker*, 369 U.S. at 217; *Powell v. McCormack*, 395 U.S. 486, 517–18 (1969). Accordingly, if the District Court determines that Tennessee or Texas law applies, then it should not dismiss the case. Instead, it should foreclose the plaintiffs from obtaining the types of damages that are assigned using proportional liability but allow the plaintiffs to proceed on any damages claim that does not implicate proportional liability (such as nominal damages, if available).

Eliminating the plaintiffs' claims for these damages is the appropriate solution to the introduction of a political question by KBR's defense because remedies, unlike breaches of a duty owed, can be extricated from a

36

case. We are mindful that the test from *Baker* is that one of the listed factors must be "inextricable from the case." 369 U.S. at 217. This suggests that if an issue can be extracted from the case, then the case should be permitted to proceed with that issue removed—which is exactly what the District Court is directed to do if Tennessee or Texas law applies.

*Powell v. McCormack* also suggests that this is the correct approach. There, the Supreme Court analyzed federal courts' ability to "mold effective relief" separately from "whether the duty asserted can be judicially identified and its breach judicially determined." 395 U.S. at 517–18 (quoting *Baker*, 369 U.S. at 198). Importantly, when discussing the ability to provide relief, the Court avoided deciding whether the request for injunctive relief introduced a nonjusticiable issue. Instead, it determined that the plaintiff's request for declaratory relief was justiciable. *Id.* This suggests that when the request for one type of remedy is foreclosed by the political-question doctrine, plaintiffs may proceed if they are seeking other damages that do not implicate the doctrine. Accordingly, because KBR's argument that the military was a proximate cause implicates unreviewable strategic military decisions only because of the necessity of apportioning fault, the plaintiffs may still proceed if they seek any relief that does not implicate the proportional-liability system.

### d) KBR's Contributory-Negligence Defenses

Whether KBR's contributory-negligence defense presents a nonjusticiable issue also turns on the applicable state law. KBR argues that it is not liable because Staff Sergeant Maseth acted negligently when he decided to take a shower in his barracks despite allegedly knowing of the risk. Contributory negligence allows defendants to avoid liability if they can show that the injured party's own negligence caused more than 50 percent of the harm.[13] 42 Pa. Cons. Stat. § 7102 (providing that a plaintiff's negligence is not a bar to recovery if "such negligence was not greater than the causal negligence of the defendant"); *McIntyre*, 833 S.W.2d at 57 (holding that a plaintiff's negligence bars recovery only if it is not "less than . . . the defendant's negligence"); Tex. Civ. Prac. & Rem. § 33.001 (providing that "a claimant may not recover damages if

---

[13] The denomination of this defense is confusing because of state variations. While several states refer to it as "contributory negligence," *see, e.g.*, *Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492, 496 (Pa. 2010), others refer to it as "modified-comparative negligence," *see, e.g.*, *McIntyre v. Balentine*, 833 S.W2d 52, 57 (Tenn. 1992). We use the term "contributory negligence" primarily because that is how the parties refer to it.

Although KBR does not currently make a comparative-negligence argument, our analysis of its contributory-negligence defense would apply to it with equal force.

his percentage of responsibility is greater than 50 percent"). KBR has presented sufficient evidence from which a reasonable jury could find that Staff Sergeant Maseth was aware of the electrocution risk and that safe alternative showering facilities were available. Such evidence could lead a fact finder to conclude that the staff sergeant was negligent in using the barracks shower.

This defense might require evaluation of strategic military decisions. To determine whether Staff Sergeant Maseth's alleged negligence caused more than 50 percent of the harm, the degree of causation that can be assigned as between the military's alleged negligence and KBR's alleged negligence must also be determined. That is, the proportion of the injured party's fault cannot be decided without also effectively deciding the extent to which the negligence of other parties caused the harm. For example, the relevant Pennsylvania Suggested Standard Civil Jury Instruction requires that the jury determine if the plaintiff's negligence is greater than 50 percent by assigning fault to each defendant and then to the plaintiff. Pa. Bar Inst. Bd. of Dirs., *Pennsylvania Suggested Standard Civil Jury Instructions* § 13.230 (4th ed. 2008). That means that for the fact finder to find that Staff Sergeant Maseth was, say, 60 percent at fault, the fact finder would have to assign fault to KBR and the military individually that summed to 40 percent. This assignment of fault to the military inevitably would require evaluating the wisdom of the strategic military decisions

that caused the death.[14] This defense therefore might require evaluation of strategic military decisions and make this case nonjusticiable.

Whether it does, however, depends on whether state law allows the fact finder to assign fault to nonparties and whether Staff Sergeant Maseth was negligent. The military is not a party to this suit and, as explained, the source of the nonjusticiable issue in KBR's contributory-negligence defense is the need to assign fault to the military to determine whether Staff Sergeant Maseth was more than 50 percent responsible for the harm suffered. So if state law does not permit the assignment of fault to nonparties, then KBR's defense does not require assigning fault to the military or evaluating strategic military decisions. As mentioned above, it is yet to be determined if Pennsylvania,

---

[14] Because this defense introduces a nonjusticiable issue through the assignment of fault to the military, for KBR to rely on this as a basis for dismissing this case on political-question grounds, it must first present sufficient evidence from which a reasonable jury could assign some fault to the military for Staff Sergeant Maseth's death. For the reasons explained in the analysis of KBR's proximate-cause defense, KBR has met that standard by presenting evidence that the military's strategic decisions were negligent and a proximate cause of the death. *See supra* Part II.A.1.c.

Tennessee, or Texas law applies in this case. *Harris*, 878 F. Supp 2d at 567. These states differ on whether a nonparty can be assigned fault by a fact finder deciding if a plaintiff's fault is greater than other tortfeasors'. As a result, the District Court must determine which state's law applies before it can resolve whether KBR's defense introduces a nonjusticiable issue.

Pennsylvania does not permit assigning fault to nonparties for the purpose of contributory-negligence defenses. *See* 42 Pa. Cons. Stat. § 7102 (providing that a plaintiff's negligence bars recovery if it is "greater than the causal negligence of the *defendant or defendants against whom recovery is sought*" (emphasis added)); *Kelly v. Carborundum Co.*, 453 A.2d 624, 627 (Pa. Super. Ct. 1982) (rejecting the defendant's argument that § 7102 permits "apportionment among all tortfeasors causally responsible for an injury" and explaining that the statute "merely provides for apportionment among those defendants against whom recovery is allowed").[15]

---

[15] *See also Thornton v. Philadelphia Hous. Auth.*, 4 A.3d 1143, 1153 (Pa. Commw. Ct. 2010) ("A plaintiff's recovery is barred only if his contributory negligence is greater than the causal negligence of the defendants against whom recovery is sought."); *Heckendorn v. Consol. Rail Corp.*, 465 A.2d 609, 612 (Pa. 1983) ("[I]t is clear that in the Comparative Negligence Act the legislature did not contemplate an apportionment of

41

So if Pennsylvania law applies, then KBR's contributory-negligence defense—like its proximate-cause defense—does not introduce a nonjusticiable issue.

Tennessee and Texas, however, are another matter. These states permit fault to be assigned to nonparties for the purposes of contributory negligence. *See Mullins v. State*, 294 S.W.3d 529, 536 (Tenn. 2009) (explaining two principles of Tennessee tort law, which "are that all tortfeasors must be joined in the suit unless joinder is specifically prohibited by law . . . and that parties may assert, as an affirmative defense, that another party or even a non-party is responsible for the plaintiff's injuries"); Tex. Civ. Prac. & Rem. § 33.001 (providing that "a claimant may not recover damages if his percentage of responsibility is greater than 50 percent"); *id*. § 33.003 (providing that fact finders must assign responsibility to "each claimant; each defendant; each settling person; and each responsible third party who has been designated under § 33.004 [which contains several procedural requirements]"); *Martin K. Eby Const. Co. v. LAN/STV*, 350 S.W.3d 675, 680 (Tex. App. 2011)

---

liability between one or more third party tortfeasors (against whom recovery may be had) and the plaintiff's employer (against whom recovery may neither be sought nor allowed)."); *Morris v. Lenihan*, 192 F.R.D. 484, 492 (E.D. Pa. 2000) ("[A]pportionment may only take place among parties that are properly in the case.").

("Section 33.003 requires the trier of fact to determine the percentage of responsibility for each claimant, defendant, settling person, and responsible third party who "caus[ed] or contribut[ed] to cause in any way the harm for which recovery of damages is sought . . . ."). So if Tennessee or Texas law applies, then KBR's contributory-negligence defense introduces a nonjusticiable issue as long as KBR can show that Staff Sergeant Maseth acted negligently.

KBR must be able to show that Staff Sergeant Maseth acted negligently for its contributory-negligence defense to introduce a nonjusticiable issue into this case under Tennessee or Texas law. If he was not negligent, then there is no need to determine the degree of fault for which the military is responsible. As explained, only the comparison of Staff Sergeant Maseth's negligence to that of KBR's and the military's implicates nonjusticiable issues. Deciding whether the staff sergeant was negligent does not. This, like the assumption-of-risk defense, depends entirely on factual questions regarding his knowledge of the risk and the availability of alternative showers. Unlike in *Taylor*, where the injured party's alleged negligence was that party's decision to ignore a strategic military decision about the number of generators a tank ramp needed, 658 F.3d at 410–11, there is no evidence that Staff Sergeant Maseth was second-guessing a military decision about showering by using the shower in his barracks. So if the District Court concludes that

43

Tennessee or Texas law applies, then the fact finder must first determine whether Staff Sergeant Maseth was negligent. If he was, then the case must be dismissed as nonjusticiable. If he was not, then the case will proceed to the merits.

### 2. The Remaining Political-Question Factors

Resolution of the remaining political-question factors—whether this case presents issues that lack judicially manageable standards or that cannot be resolved without affording respect to the coordinate branches of government—turns on the same analysis. Both of these bases for nonjusticiability are inextricable from this case if the fact finder must evaluate the wisdom of the military's housing and maintenance decisions. And regarding the lack of a judicially manageable standard, "it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Housing and maintenance decisions on a battlefield are exactly this type of decision—complex, subtle, and professional decisions within the military's professional judgment and beyond courts' competence. For this same reason, resolving a case requiring evaluation of these decisions would also fail to express the respect due to the coordinate branches of government. *See Aktepe v. United*

*States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (explaining that such respect is not shown when courts "subject[] [the political branches'] discretionary military and foreign policy decisions to judicial scrutiny, notwithstanding the judiciary's relative lack of expertise in these areas").

Whether this case includes an issue whose resolution would express a lack of respect or that lacks a manageable standard thus turns on whether a strategic military decision must be reviewed. This is the same question that controlled our earlier analysis of whether this case contains an issue textually committed to another branch. Consequently, the remaining political-question factors will be inextricable from this case only if the case presents an issue textually committed to another branch. As a result, if Pennsylvania law controls, then this case lacks any nonjusticiable issues. But if either Tennessee or Texas law controls, then the case contains nonjusticiable issues that require eliminating any damages based on proportional liability. In such instance, if Staff Sergeant Maseth is found contributorily negligent, the case should be dismissed.

B.      Section 2860(j) Combatant-Activities Preemption

The District Court alternatively held that the plaintiffs' claims are preempted by the combatant-activities exception to the Federal Tort Claims Act. The Federal Tort Claims Act waives the United States' sovereign immunity for many tort claims against it. 28

U.S.C. § 2674. But that waiver contains numerous exceptions, one of which—the combatant-activities exception—is raised here. Under the combatant-activities exception, the United States remains immune from "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). Of course, defense contractors are not part of the government, so concepts like sovereign immunity, waiver of sovereign immunity, and exceptions to waiver do not apply *directly* to defense contractors. In fact, the Federal Tort Claims Act says as much. 28 U.S.C. § 2671 (stating that "Federal agency" "does not include any contractor with the United States").

But the Supreme Court has held that the Act's exceptions sometimes express federal policies that impliedly preempt state claims against defense contractors providing services to the military. In *Boyle v. United Technologies*, the Court held that another exception—§ 2860(a)'s discretionary-function exception—provides a federal policy that preempts state tort law interfering with it. 487 U.S. at 511–12. The question before the Court was whether a claim for defective design against a helicopter manufacturer was preempted. *Id.* at 503. The Court first recognized that there is a federal interest in federal-government contracts with private parties that is implicated in suits by private parties against a government contractor for conduct resulting from the government contract. *Id.* at 504–07.

46

To determine whether the plaintiff's state claim conflicted with this federal interest, the Court relied on the discretionary-function exception to establish the scope of the preempting policy. *Id*. at 510–11. This exception prevents suits against the United States for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). From this exception, the Court derived a federal policy for avoiding second-guessing government decisions that "often involve[] not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations." *Boyle*, 487 U.S. at 511. And because state design-defect claims against "contractors would produce the same effect sought to be avoided by the FTCA exception," *id*., these claims must also be preempted.

Importantly, the Court did not determine whether the state laws in question were preempted by simply applying the statute as if the contractor were the federal government. Instead, it created a three-part test designed to protect the federal policy underlying § 2680(a). *Id*. at 512 (holding that state claims against procurement contractors are preempted if "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the

47

supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States").

To decide how *Boyle* applies to § 2680(j), we must undertake the same analytic process. *Boyle*'s analysis involved three steps: (1) identify a unique federal interest that is associated with a FTCA exception, (2) determine the scope of the policy that underlies the exception, and (3) derive a test that ensures preemption of state laws that frustrate this policy. The two circuits that have confronted this agree that § 2680(j) represents a unique federal interest in the management of wars. *Saleh v. Titan Corp.*, 580 F.3d 1, 5–7 (D.C. Cir. 2009); *Koohi*, 976 F.2d at 1336–37. But they disagree over the scope of the federal policy underlying the exception and, as a consequence, what test should follow.

The Ninth Circuit, in *Koohi*, held that "one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." 976 F.2d at 1337. By contrast, in *Saleh*, the D.C. Circuit held that "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit." 580 F.3d at 7. This latter, more

expansive, policy is partially based on § 2680(j)'s use of "arising out of," which we know from "workmen's compensation statutes to denote *any* causal connection," *id*. at 6.

There is very little authority for us to rely on to resolve this disagreement. The Federal Tort Claims Act does not explicitly state the purpose of the exception, nor does legislative history exist to shed light on it. *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948) ("An examination of the record fails to produce clear evidence of Congressional intent or policy which might guide us toward a proper interpretation of [§ 2680(j)]."). We agree with the D.C. Circuit that the phrase "arising out of" suggests that this immunity is quite broad. As a result, the Ninth Circuit's statement of purpose, limiting the policy to foreclosing any "duty of reasonable care . . . to those against whom force is directed," is too narrow[16]— which is well demonstrated by the fact that the plain language would prevent suits against the military for harm it causes through friendly fire.

This leaves the D.C. Circuit's articulation of the purpose, which we find persuasive in some respects. We

---

[16] In fairness, the Ninth Circuit describes its articulated purpose as "one purpose," *Koohi*, 976 F.2d at 1337, which means that the court may recognize that there are other, broader purposes as well.

agree that the statute represents a federal policy to prevent state regulation of the military's battlefield conduct and decisions. *See Saleh*, 580 F.3d at 7 (explaining that § 2680(j) reveals Congress' intent to "preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit"). But we do not go as far as the D.C. Circuit's holding that § 2680(j) reveals a policy of "the elimination of tort from the battlefield." *Id*. at 7; *see also id.* ("The very purposes of tort law are in conflict with the pursuit of warfare."). This broader statement loses sight of the fact that § 2680(j), as a part of the Federal Tort Claims Act, does not provide immunity to nongovernmental actors. So to say that Congress intended to eliminate all tort law is too much, which the D.C. Circuit itself implicitly recognizes by crafting a test that does not preempt state tort claims challenging contractors' performance of certain kinds of contracts. *Id*. at 9–10.

The purpose underlying § 2680(j) therefore is to foreclose state regulation of the military's battlefield conduct and decisions. With this policy in mind, we turn to the last step of the *Boyle* framework: deriving a test to decide which state claims are preempted. The D.C. Circuit articulates one test: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's

50

engagement in such activities shall be preempted." *Id.* at 9. KBR urges us to adopt the Solicitor General's two-part test: (1) "whether a claim against the United States alleging similar conduct would be within the FTCA's exception for combatant activities," and (2) "whether the contractor was acting within the scope of its contractual relationship with the federal government at the time of the incident out of which the claim arose." Br. for the United States as Amicus Curiae, *Al Shimari v. CACI Int'l, Inc.*, Nos. 09-1335, 10-1891, 10-1921, at 17–19 (4th Cir. Jan. 14, 2012)).

We adopt the D.C. Circuit's combatant-activities, command-authority test because it best suits the purpose of § 2680(j). The Solicitor General's test is overinclusive. The latter test, by preempting combatant-activity-related contractor conduct so long as the conduct is within the "scope of [the contractor's] contractual relationship," would insulate contractors from liability even when their conduct does not result from military decisions or orders. The Solicitor General makes this clear by explaining that under his approach, "federal preemption would generally apply even if an employee of a contractor allegedly violated the terms of the contract . . . as long as the alleged conduct at issue was within the scope of the contractual relationship." *Id.* at 20 (defining scope by analogy to the Westfall Act and *Barr v. Matteo*, 360 U.S. 564 (1959) (plurality opinion)). A scope of preemption that includes contractors' contractual violations is too

51

broad to fit § 2680(j)'s purpose because the conduct underlying these violations is necessarily made independently of the military's battlefield conduct and decisions. After all, if the contractors' conduct did follow from the military's decisions or orders, then the conduct would presumably not be in violation of the contract. State regulation of these violations thus does not constitute the regulation of the military's battlefield conduct or decisions that § 2680(j) is meant to prevent.

The combatant-activities, command-authority test, in contrast, is well-tailored to the purpose underlying § 2680(j): The first prong—whether the contractor is integrated into the military's combatant activities— ensures that preemption occurs only when battlefield decisions are at issue. And the second prong—whether the contractor's actions were the result of the military's retention of command authority—properly differentiates between the need to insulate the military's battlefield decisions from state regulation and the permissible regulation of harm resulting solely from contractors' actions.

Under the combatant-activities, command-authority test we adopt, the plaintiffs' claims are not preempted. As to the combatant-activities prong, KBR's maintenance of electrical systems at a barracks in an active war zone qualifies as integration into the military's combatant activities. The plaintiffs contend otherwise, arguing that this maintenance is not a combatant activity

52

because it does not include actual combat such that it "arises from combatant activities of the military or naval forces." This takes too narrow a view of the phrase "combatant activities." As the Ninth Circuit explained, combatant activities "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Johnson*, 170 F.2d at 770. As an example, the Court explained that "[t]he act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity.'" *Id.* Maintaining the electrical systems for a barracks in an active war zone is analogous to supplying ammunition to fighting vessels in a combat area and is certainly "necessary to and in direct connection" to the hostilities engaged in by the troops living in those barracks. The plaintiffs' argument is thus unpersuasive and the first prong of the test is satisfied.

This case is ultimately not preempted, however, because the second prong is not satisfied. The military did not retain command authority over KBR's installation and maintenance of the pump because, as explained above, the relevant contracts and work orders did not prescribe how KBR was to perform the work required of it. Instead, the contracts and the work orders provided for general requirements or objectives and then gave KBR considerable discretion in deciding how to satisfy them. *See supra* text accompanying note 4. As the D.C. Circuit explained, these types of contracts are "performance-

53

based" contracts that "'describe the work in terms of the required results rather than either "how" the work is to be accomplished or the number of hours to be provided.'" *Saleh*, 580 F.3d at 10 (quoting 48 C.F.R. § 37.602(b)(1)). "[B]y definition, the military [cannot] retain command authority nor operational control over contractors working on [this] basis and thus tort suits against such contractors [are] not [ ] preempted" under the combatant-activities, command-authority test. *Id*. The considerable discretion KBR had in deciding how to complete the maintenance at issue here thus prevents the plaintiffs' suit from being preempted because the military did not retain command authority over KBR's actions.

III

We will remand to the District Court for proceedings consistent with this opinion. The plaintiffs' claims are not preempted by the combatant-activities exception, and it is possible that those claims are not foreclosed by the political-question doctrine. To decide the latter issue, the District Court will first need to decide which state's law applies. If Pennsylvania law applies, then this case lacks any nonjusticiable issues and may proceed. But if either Tennessee or Texas law applies, then the case contains nonjusticiable issues. At the least, in that situation, the District Court will need to eliminate any damages that are based on proportional liability but allow the case to move forward to provide such other remedies as may exist. At most, the case will be

dismissed if Staff Sergeant Maseth is first found contributorily negligent.