

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00348-CV

_____

NICOLE VAN DORN PRESTON AS SURVIVING SPOUSE AND PERSONAL REPRESENTATIVE FOR THE ESTATE OF LT. J WESLEY VAN DORN, USN, DECEASED; AMY SNYDER, AS SURVIVING SPOUSE AND PERSONAL REPRESENTATIVE FOR THE ESTATE OF LT. SEAN CHRISTOPHER SNYDER, USN, DECEASED; CHEYENNE COLLINS, AS SURVIVING SPOUSE AND PERSONAL REPRESENTATIVE FOR THE ESTATE OF PETTY OFFICER 3RD CLASS BRIAN ANDREW COLLINS, USN, DECEASED; AND PETTY OFFICER 2ND CLASS DYLAN MORGAN BOONE, USN, Appellants

V.

M1 SUPPORT SERVICES, L.P., Appellee

_____

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 16-00046-393

_____

Before Gabriel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

This case arises from the crash of a United States Navy helicopter off the coast of Virginia during a minesweeping exercise. The crash, which the Navy determined was related to Kapton[1] wiring issues, resulted in the deaths of three servicemembers and serious injuries to two others. Appellants are the spouses (Nicole Van Dorn Preston, Amy Snyder, and Cheyenne Collins)[2] of the deceased servicemembers (Lieutenant J Wesley Van Dorn, Lieutenant Sean Christopher Snyder, and Petty Officer 3rd Class Brian Andrew Collins) and one of the injured servicemembers (Petty Officer 2nd Class Dylan Morgan Boone). In this appeal from the granting of a plea to the jurisdiction to appellee M1 Support Services, L.P. (M1), a company who performed maintenance on the helicopter, we are asked to consider whether the political question doctrine applies to the facts of this case. We conclude that it does and, therefore, affirm the order granting the plea to the jurisdiction and dismissing the case.

---

[1]According to a technical manual dated September 15, 2009, "published by direction of the commander, Naval Air Systems Command," Kapton is "[a] trademark of the DuPont Company for their polyimide resin film used as wire insulation." It also provides, "Kapton wire has poor life characteristics and is no longer recommended for Navy aircraft."

[2]In the style of the plea to the jurisdiction, the spouses are identified as Nicole Preston, Amy Provido, and Cheyenne Strauser.

## II. BACKGROUND

In 2013, M1, a small business with its headquarters in Denton, Texas, contracted with the Navy to perform phase maintenance on MH-53E Sea Dragon helicopters in Navy squadrons HM-14 and HM-15. "Phase maintenance" refers to recommended service (based on the original equipment manufacturer's service manuals and the Navy's log books) after approximately 200 flight hours. Work was performed in accordance with a document called the "Performance Work Statement." Pursuant to the contract, M1 was to "provide organizational level (O-Level) maintenance support as outlined in Section 4.0." Section 4.0 stated in part, "The Contractor shall perform requirements in a manner that meets or exceeds the intent of CNAFINST 4790.2 series, applicable Naval Aviation Maintenance Program Standard Operating Procedures (NAMPSOPs)[,] and local NAMPSOP instructions."

The Performance Work Statement required that all work done by M1 be "in accordance with applicable publications, technical directives, instructions, standards, and procedures contained in pertinent manuals utilizing blueprints, drawings[,] or schematics as provided by the [Contracting Officer's Representative]." In addition, it provided a "[m]inimum [t]eam [c]omplement of skill sets required" of M1, which included the specific skills, knowledge, and quantity of M1's staff. It also included "Directives and Instructions," which referenced various military procedures, manuals, guidelines, and publications.

3

In her affidavit, M1's majority owner, Kathy Hildreth, stated that the Navy prescribed the number of employees for each task order and their specific qualifications. Further, she averred that the Navy not only approved the M1 personnel who provided maintenance services on HM-14's and HM-15's helicopters but also recommended, through its contracting officer's representative Lieutenant Mike Caffey, that M1 hire Gene Mettler as its site lead.

According to Hildreth, phase maintenance was done from May 2013 to September 2015 on HM-14's and HM-15's helicopters. Hildreth stated that the Navy supplied M1 a technical manual, which was only accessible on a Navy website and only during the term of a task order, which contained phase/maintenance cards for all of M1's phase maintenance activities. She testified that the Navy set the timeframes, performed its own quality assurance inspections, and supplied all helicopter parts used in the maintenance activities.

Mettler joined the Navy when he was eighteen years old, received maintenance training, and then served as a remedial instructor for mechanics. After being in Helicopter Combat Support Squadron, he was a quality analyst before serving in maintenance control. He retired in 2012 as a chief petty officer. Mettler testified that he supervised twenty-four employees as site lead for M1, and all of M1's work went through the Navy's Contract Officer Representative Caffey, who set timeframes for completion. According to Mettler, in September and October 2013, M1 performed Phase C maintenance on the subject helicopter. A phase inspection—consisting of A,

4

B, C, and D phases—"identified specific areas and tasks, areas that need to be inspected in that timeframe."

According to Mettler, in approximately 2010, he "was informed by United States Navy publications of Kapton wiring issues in Sea Dragon and Super Stallion helicopters and that the technical manual would eventually be modified to account for those issues." However, to the best of his knowledge, the Navy did not implement those modifications until October 2015.

Mettler averred that the Navy did not require that M1's Phase C maintenance include inspection of the subject helicopter for the Kapton wiring and fuel transfer issues complained of by Appellants in this lawsuit. In addition, "[a]s to the task order regarding HM-14's and HM-15's helicopters and the Kapton wiring and fuel transfer issues complained of by [Appellants] in this lawsuit, M1 did not attempt to modify the existing technical publications or directives or to evaluate the history of the helicopters for discrepancies."

Phase Maintenance Card M-12, dated January 15, 2010, which dealt with the fuel system, required M1 to inspect for "1. Fuel and vent lines in cabin for leakage, chafing, obvious damage, and security[;] 2. Fuel dump tube outlets on outside of fuselage for obvious damage[;] 3. No. 2 engine firewall shutoff valve for leakage and security[; and] 4. Inspect all brackets and lines for cracks and security." The card identified the "work zone" and the time to be spent on the inspection. Other phase cards addressed different parts of the helicopter to be inspected, including "visible

5

structures, skin, and attachment fittings for cracks, distortion, and loose or missing fasteners." The inspection manual "contain[ed] the minimum phased maintenance requirements to inspect the helicopter for material degradation and to perform essential preventive maintenance."

Christopher Varney, the Quality Assurance representative on the contract from the time M1 arrived at HM-14 until 2016, testified that he did "little spot-checks on [M1]," but "was not authorized to inspect their work unless it was - - I seen that it was definitely been done wrong." In their response to the plea to the jurisdiction, Appellants state, "M1 was paid to exclusively perform tasks traditionally done by the Navy on the helicopter precisely because the Navy wanted to 'free up' its own 'manpower' and focus on other Naval operations."

According to Hildreth and Mettler, the Navy "performed its own quality assurance inspection of M1's Phase C maintenance and accepted same." Further, both testified that the Navy never advised M1 of any issues with M1's Phase C maintenance on the helicopter.

On October 22, 2013, the helicopter was accepted back by the Navy, and a "Certificate of Completion and Acceptance" was signed. The "Certification" on the Certificate stated, "All work and inspection requirements, including ground functional test (if required), in accordance with above numbered order and respective Statement of Work have been satisfactorily completed."

According to Appellants' pleadings, the helicopter was operated by HM-14 for a training flight involving ocean minesweeping and helicopter ramp operator training on January 8, 2014. The training operations began off the coast of Virginia Beach, Virginia, in the morning and included towing a minesweeping device through the water. Appellants' pleadings allege that, after less than two hours[3] of operations, an explosion occurred "near the port wall aft of the gunner's window." As smoke filled the helicopter, "the pilots lost spatial awareness and the helicopter violently struck the water and began to sink." As a result, three servicemembers died, and two were injured.

The Navy investigated the crash and prepared a report. Both Hildreth and Mettler testified that the Navy never contacted them regarding its investigation of the crash. The Navy's report concluded that the fire aboard the helicopter "was caused by the ignition of fuel in the aluminum transfer tube which had been breached by the chafing of both the tube and the insulation covering electrical wiring within the aircraft." The Navy's investigation also stated that the helicopter "was in compliance with all required technical directives at the time of the mishap"[4] and "was in compliance with all special inspections." Further, it concluded that the helicopter was

---

[3]The Navy's investigative report states that the explosion occurred "approximately 2.5 hours into the flight."

[4]In the Performance Work Statement, a "mishap" is defined as "an unplanned event or series of events, directly involving naval aircraft which result in ten thousand dollars or greater cumulative damage to naval aircraft, other aircraft[,] and property."

7

"properly maintained, authorized 'Safe for Flight[,]' and scheduled for the mishap flight. The mishap aircraft was properly inspected and mechanically sound prior to the mishap flight." The report

> specifically noted that the inspection of internal wiring bundling and other objects inside the aircraft for signs of chafing was not specifically required. While all hands are instructed and encouraged to bring any observed discrepancies to the attention of maintenance and safety personnel and while aircraft are subjected to routine inspections, that no one detected the rubbing discovered during the post-mishap engineering investigations was not surprising given the purpose of pre-flight inspections and the amount of wiring inside the [helicopter]. . . . There is no evidence of carelessness, neglect[,] or malpractice on the part of the crew of [the helicopter].

However, the report recommended that "a minimum one-time safety inspection of all fuel lines and wires for evidence of chafing [be conducted]" and that "a periodic schedule for inspecting fuel lines and wires for evidence of chafing be developed."

William S. Lawrence, a retired United States Marine Colonel and Naval Aviator and pilot of over fifty years, testified about the "well known" deficiencies of Kapton wiring, which "[l]iterally everyone in the aviation maintenance community knows and understands." He stated

> Kapton-insulated wiring has been widely used in civil and military aircraft because it is lighter than other insulators and has good insulating and temperature characteristics. However, it ages poorly, has very poor resistance to mechanical wear, and is particularly subject to abrasion within cable harnesses due to aircraft vibration movement.

Further, he testified that M1 should have been looking for deterioration as they performed the Phase C inspection.

8

He also stated that Kapton wiring "has been implicated in numerous fatal aircraft electrical fires and failures, including the September 1998 crash of an MD-11, Swissair Flight 111, over Nova Scotia." According to Lawrence, "The Naval Air Systems Command, which is responsible for procurement and maintenance of all naval aircraft, issued an Engineering Change Proposal to replace the Kapton wiring in the M/CH-53 fleet, but because of funding considerations, elected not to implement the proposal." Because of this, he believed that "inspections of wiring harnesses were vital and were increased in an attempt to prevent the very event that caused this crash." Additionally, he noted that "a year prior to the crash, L3, another civilian contractor similar to M1, had issued a 'red flag' warning of noted discrepancies in the crash helicopter, reporting 'wiring routed over clamps throughout aircraft' and 'loose wire throughout cabin and cockpit.'"

A Navy Hazard Report dated November 12, 1988, also noted that Kapton wiring "has been found as unacceptable due to its flammability." However, the report stated that it continued to be utilized because "[t]he cost savings realized by the use of Kapton wiring would be eradicated by the loss of a single weapons system because of faulty wiring."

According to Lawrence, after the crash, a card was added ensuring an inspection of wire harnesses and bundles and inspection of Kapton wiring in Stations 162 to 522, the areas where the fire occurred on the crash helicopter. The revised phase cards, M-12, M-12.1, and M-12.2, dated October 1, 2015, included specific "[s]upport

9

[e]quipment [r]equired," which was not on the previous card. In addition, it increased the time for inspection from "0.2" hours to "3.0" hours and went from four to twenty-six lines of descriptive tasks. While the revised cards referenced other "NAVAIR" manuals, the previous card contained no such reference.

Appellants filed suit against M1 for wrongful death, survival damages, and personal injury based on negligence, strict products liability, and breach of warranty. The pleadings allege:

> At the time of the subject flight, the subject helicopter and its component parts, including its three engines ("subject engines"), wires and wiring insulation, fuel lines/fuel transfer tubes, fasteners, and ties had recently undergone the first of three service life extending phase inspections, maintenance[,] and overhauls. As part of these phases, Kapton wiring in the subject helicopter was to be inspected and replaced as necessary. At the time of the subject flight, not all of the Kapton wiring had been removed from the subject helicopter. . . . The Kapton wiring was inspected, assembled, maintained, installed, warranted, and/or distributed by M1. . . .
>
> At all relevant times, M1 had a duty to inspect and remediate the damaged wire bundle and fuel transfer tube that caused the on-board explosion and subject helicopter crash. M1, which was tasked with scheduled/unscheduled maintenance, phase inspections, helicopter maintenance documentation, helicopter inspection, troubleshooting, preservation, general helicopter maintenance, ordnance handling[,] and technical directive compliance and modifications, failed to do so. M1 therefore breached its duty to [Appellants], causing [Appellants'] injuries.

Appellants sought "all available damages" under the "Death on the High Seas Act" and "general maritime law." *See* 46 U.S.C.A. § 30301, *et seq.*

In response, M1 filed its answer, which included a general denial and various defenses including comparative fault, "proportionate responsibility of [Appellants]

10

and non-parties," and entitlement to settlement credits. M1 also filed special exceptions and a motion for leave to designate a responsible third party. In the motion for leave, M1 requested that they be allowed to join the Navy as a responsible third party. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.004. M1 alleged that the Navy should be joined because it:

- Proscribed the number of employees for the task order and their specific specifications;

- Approved the M1 personnel assigned to the task order who were veterans previously trained and certified by the Navy;

- Supplied a technical manual containing phase/maintenance requirement cards for all of M1's phase maintenance activities under the task order;

- Did not retain M1 to modify the existing technical publications or directives or to evaluate the history of the helicopters for discrepancies;

- Set the timeframes for M1's phase maintenance activities on the helicopters and performed its own quality assurance inspections of M1's services;

- Supplied all helicopter parts used in M1's maintenance activities;

- Performed its own quality assurance inspection of M1's Phase C maintenance and did not identify any discrepancies with the Helicopter; and

- After accepting return of the Helicopter, continued to perform its own pre-flight inspections and maintenance over the course of the next 119 flight hours.

Appellants filed a response to the motion for leave, stating that they "have no procedural objection to [M1's] designation of the United States Navy as a potentially liable third party."

In a supplemental motion for leave, M1 asked to join three settling parties as responsible third parties. *See id.* In the supplemental motion, M1 alleged that around the same time Appellants filed the instant lawsuit, they

> filed a parallel lawsuit in the United States District Court for the District of Connecticut. The defendants in the Connecticut lawsuit included the alleged manufacturers of: the helicopter (Sikorsky) [Sikorsky Aircraft Corporation and Sikorsky Support Services, Inc. d/b/a Sikorsky Aerospace Services]; the engines (GE) [General Electric Company]; and the allegedly defective wiring (E.I. du Pont) [E.I. du Pont de Nemours and Company].

M1 stated that all of these entities were settling parties who it wanted to designate as responsible third parties. In addition, M1 moved to designate L-3 Communications Corp., who it identified as the "sole remaining defendant in the parallel Connecticut lawsuit" and who "provided depot-level maintenance on the helicopter prior to M1's phase-maintenance inspection," as a responsible third party.[5] Finally, M1 sought to designate John Doe as a responsible third party, alleging that "during the time period in between L-3's depot-level maintenance and M1's phase maintenance, John Doe performed phase maintenance on the helicopter." In their response to the supplemental motion, Appellants stated that they had no procedural objection to the designation of Sikorsky, G.E., E.I. du Pont, and L-3 Communications as responsible

---

[5]In their brief, Appellants state that they "have since resolved their claims against the remaining defendant in the federal action in Connecticut."

third parties but did oppose the designation of an unnamed John Doe as one.[6]  The record does not contain an order ruling on either the motion or the supplemental motion for leave to designate responsible third parties.[7]

Thereafter, M1 filed its traditional motion for summary judgment regarding government contractor and Defense of Production Act defenses.  *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S. Ct. 2510, 2518 (1988); 50 U.S.C.A. § 4557.  Appellants responded to the motion.  M1 filed a reply to the response.[8]

Approximately two weeks after the Texas Supreme Court issued its opinion in *American K-9 Detection Services, LLC v. Freeman* ("*K-9*"), M1 filed its plea to the jurisdiction.  *See* 556 S.W.3d 246 (Tex. 2018).  Appellants filed their response in opposition to the plea together with a cross-motion to strike M1's designation of the Navy as a responsible third party.[9]  M1 filed a reply and response to Appellants'

---

[6]In addition, Appellants "reserve[d] their right to argue that the contents of the jury verdict form and the apportionment of damages in this case will be controlled by substantive maritime law."

[7]An order granting a motion for leave is required to designate a responsible third party.  *Valverde v. Biela's Glass & Aluminum Prods.*, 293 S.W.3d 751, 755 (Tex. App.—San Antonio 2009, pet. denied).

[8]Neither the clerk's record nor the reporter's record reflect a hearing or ruling on the motion for summary judgment.  Appellants note in their brief that "[a]t the time that the Plea to the Jurisdiction was heard, Appellee's summary judgment motion was pending before the trial court."

[9]Neither the clerk's record nor the reporter's record reflect a ruling on the motion to strike.  In addition, the trial court noted in its findings of fact that it "has not granted the Motion to Strike."

response and motion. The plea to the jurisdiction, response, and reply relied on the evidence attached to the motion for summary judgment and the response to the motion, as well as additional evidence attached to their briefs. On September 20, 2018, the court held a hearing on the plea to the jurisdiction. By order signed September 24, 2018, the trial court granted the plea to the jurisdiction and dismissed the case.

Pursuant to Appellants' request, the trial court entered its findings of fact and conclusions of law. In its findings of fact, the court found in part:

8. The Navy had a substantial role in M1's phase maintenance on the subject aircraft.

9. The task order contained a Performance Work Statement in which the Navy required compliance with "applicable documents/directives" provided by the Navy to M1, the correction of discrepancies observed by the Navy, and compliance with the Navy's specific staffing instructions.

10. The Navy supplied a detailed technical manual [] containing phase/maintenance requirement cards for M1's phase maintenance inspections.

11. Each work card set forth the applicable zone, time guidelines, skillset, tools, technical directives, and steps.

12. The Navy also supplied the technical directives referenced in those work cards, providing a "Toughbook" computer that contained copies of these robust reference materials.

13. The Navy set the schedule for M1's phase maintenance.

14. For each aircraft, the Navy performed some quality control functions, reviewing M1's maintenance paperwork, performing

14

spot-checks, and/or performing foreign object damage inspections (including Kapton wiring discrepancies).

15. In accordance with the Performance Work Statement, the Navy could issue corrective action requests at any time during or after M1's maintenance on a particular helicopter.

16. M1 used components from the Navy's supply system during M1's maintenance—M1 did not sell any aircraft parts to the Navy or purchase any aircraft parts from third parties.

17. The Navy approved M1's maintainers and interviewed the majority of them (all of whom were trained by the Navy during their prior service, i.e., before joining M1). [all footnotes omitted]

The conclusions of law include the following:

1. Texas's political[]question doctrine limits state-court review of the federal government's complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force. . . .

2. In [*K-9*], the Supreme Court of Texas established the following framework for the political[]question doctrine. . . .

3. The undisputed facts establish the Navy's plenary control over M1's maintenance on the Sea Dragon Helicopter. M1's maintenance decisions were de facto Navy decisions, and therefore, [Appellant's] claims are nonjusticiable.

4. Even if M1 retained a significant amount of discretion regarding the phase maintenance, [Appellants'] claims would still implicate the Navy's decisions concerning the training and equipping of a military force. [Appellants] and M1 dispute the requirements of the phase maintenance work cards, meaning that the Navy's intent would be front and center at trial. Along these lines, M1's government-contractor defense would focus on M1's compliance with the Navy's maintenance specifications and on the Navy's decisions to continue using a fleet of MH-53Es with Kapton wiring. . . . Finally, M1's comparative-fault defense would focus on the conduct of the individual Navy servicemen (Van Dorn,

15

Snyder, Collins, and Boone) involved in the accident, the Navy itself, and the settling manufacturer defendants in the parallel lawsuit. Each theory of comparative fault would require the Court to disentangle the Navy's causal role. For these reasons, [Appellants'] claims and M1's defenses also implicate the political[]question doctrine.

5. In particular, if this lawsuit were to proceed this court concludes that it would have to second guess the following military decisions and potentially some congressional procurement decisions as follows:

(i) the decision to use [K]apton coated electrical wiring and aluminum fuel tubing that could both degrade over time from chafing;

(ii) the decision to use plastic zip ties to keep Ka[p]ton wiring and fuel tubing separated;

(iii) the decision to [k]eep Sea Dragon Helicopters flying well past useful life and even past [t]he ability to obtain manufactured parts;

(iv) the decision to not completely replace Kapton wiring or otherwise substantially refurbish the Sea Dragon Helicopters with a new and different wire and fuel tubing clamping system (apparently the dangers of Kapton wiring were well known by 2014 (arguably even before the year 2000)[ )] due to other accidents and experience in the flying industry. . . .[;]

(vi) the decision as to the timing and intervals between inspections; for example why 200 hours between inspections rather than 100 hours or 50 hours; and

(vii) decisions as to what were the minimal requirements the Sea Dragon Helicopters had to meet to pass the M-1 Phase inspection. . . . In sum, the military may have decided to keep in place potentially hazardous old mine sweeping helicopters rather than procuring new mine sweeping helicopters as it needed to allocate funds for other more critical missions or projects where even more lives could be at stake. . . .

6. It is important to note that in the [*K-9*] decision that the Texas Supreme Court went through an analysis showing that there were at least 5 different scenarios for why a roof would be left off a dog kennel by the military, which ultimately could have been the cause of injury to the Plaintiff in the [*K-9*] case. This court has engaged

16

in a similar analysis because it concludes that the military's decision making will be an issue in the comparative fault analysis that would have to be engaged in at time of trial. The court concludes that the military's comparative fault would be an issue before it. . . . The fact that military decision making would be an issue precludes any judicial reapprisement and requires the court to abstain under the Political Question Doctrine.[]

7.      Based on its discriminating analysis of the record and the questions posed, the Court concludes that [Appellants'] claims would inextricably involve a reexamination of professional Navy decisions beyond the Court's power to conduct. Accordingly, the Court lacks jurisdiction over this lawsuit.

This appeal followed.

## III. DISCUSSION

### A.      Standard of Review

A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A trial court's ruling on a plea to the jurisdiction is reviewed de novo. *Suarez v. City of Tex. City*, 465 S.W.3d 623, 632 (Tex. 2015).

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, just as the trial court must do. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004); *Bland*, 34 S.W.3d at 555. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the factfinder will resolve the question. *Miranda*,

17

133 S.W.3d at 227–28. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law. *Id.* at 228. This standard mirrors our review of summary judgments where we take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009).

## B. Application of Law to Facts

Appellants raise four issues:

1. Did the record evidence raise genuine issues of material fact as to whether the United States Navy exercised complete and total control over the maintenance performed on the crash helicopter by M1 such that this case should have proceeded to trial?

2. Did the trial court improperly apply the political question doctrine to this case, which, unlike [*K-9*] arose in a domestic setting, requires only the application of traditional tort standards[,] and involves the "government contractor defense"?

3. Did the trial court err in construing the Texas political question doctrine set forth in [*K-9*] more broadly than the federal standard established in *Baker v. Carr*, 369 U.S. 186[, 82 S. Ct. 691] (1962)?

4. Did the trial court err in concluding that a jury could allocate fault to the United States Navy and the crew members of the crash helicopter under federal maritime law?

M1 responds that the "Texas Supreme Court's holding and analysis in [*K-9*] compelled the District Court's order dismissing the case." Further, they argue that nothing in *K-9*'s language or reasoning limits its holding to incidents occurring within war zones. M1 contends that the government contractor defense is not a substitute

18

for the political question doctrine. Rather, they state, "It is a substantive defense that does not bear upon the prior question of the Court's subject matter jurisdiction. The political question doctrine, by contrast, exists to prevent the judiciary from addressing matters specially entrusted to the other branches." Finally, M1 argues that an immune entity such as the Navy was properly designated as a responsible third party and, even if the Navy's responsibility could not be apportioned by the trier of fact, both the claims and defenses in this case still implicate important decisions made by the Navy.

### 1. The trial court did not err by deciding that the record did not raise genuine issues of material fact as to whether the Navy exercised plenary control over M1.

In *K-9*, the Texas Supreme Court examined the political question doctrine, which "teaches that the Judicial Branch will abstain from matters committed by constitution and law to the Executive and Legislative Branches." *K-9*, 556 S.W.3d at 249. The court described the facts addressed in *K-9*:

> Among United States military troops stationed in war zones are dogs who protect soldiers and others by sniffing out enemy improvised explosive devices ("IEDs"). The claim in this case is that because of negligent training and handling by private military contractors, one such dog bit the plaintiff on a U.S. Army base in Afghanistan. The defense is that the incident was caused by the Army's use and prescribed manner of quartering the dog.

*Id.*

After examining the facts in light of "*Marbury* [*v. Madison*, 5 U.S. (1 Cranch) 137 (1803)] and *Baker* as well as by other federal-court decisions," the *K-9* court concluded that "the dispute cannot be resolved without inquiry into military judgments that the

19

political question doctrine precludes." *Id.* 556 S.W.3d at 249–50, 254. Therefore, the court held that the claim was nonjusticiable and properly dismissed. *Id.* While the court noted that not all cases involving the military are foreclosed by the political question doctrine, it emphasized that each case requires a "discriminating analysis of the particular question posed," and the political question must be "inextricable from the case." *Id.* at 255 (quoting *Baker*, 369 U.S. at 211–212, 217, 82 S. Ct. at 707, 710). In addition, the court stated, "[i]f we must examine the Army's contribution to causation, 'political question' will loom large." *Id.* (quoting *Lane v. Halliburton*, 529 F.3d 548, 561 (5th Cir. 2008)).

To determine how to apply the political question doctrine against a private military contractor, the initial consideration is whether adjudicating the claim will require reexamination of a military decision. *Id.* at 256. When a contractor operates under the military's plenary control, the contractor's decisions may be considered de facto military decisions. *Id.* Even when the contractor retains discretion over its actions, causation defenses often pose political questions when the court must disentangle the military's and contractor's respective causal roles. *Id.* In particular, a "proportionate-liability defense may inject a nonjusticiable political question into a case." *Id.* "Similarly, a contributory-negligence defense may require reexamination of military decisions if it requires considering the fault of a military decision-maker." *Id.*

With this standard in mind, we turn to the "discriminating analysis" required by *K-9*. *Id.* at 257. In determining plenary control, we look to what extent the military

20

controlled not only what M1 did but also how and when it did it. *Compare Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009) (determining that the military exercised plenary control because "the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route []; how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between the vehicles; and the security measures that were to be taken") *and Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 411–12 (4th Cir. 2011) (stating that "an analysis of [the contractor's] contributory negligence defense would 'invariably require the Court to decide whether . . . the Marines made a reasonable decision' in seeking to install the wiring box to add another electrical generator [internal citation omitted]") *with Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 468 (3d Cir. 2013) (stating that "evaluating whether [the contractor's] work complied with [a "safe manner"] standard is a factual question for the fact finder—a question that, again, does not require evaluating any military decisions").

Noting that the Army designed and constructed the kennel and required its use, the *K-9* court held that "[t]he military had plenary control over at least some of the decisions implicated by [plaintiff's] claim." 556 S.W.3d at 258. Likewise, here the Navy maintained plenary control over at least some of the decisions implicated by Appellants' claim. Initially, the Navy supplied a technical manual, which is only

21

accessible on a Navy website and only during the term of a task order, containing phase-maintenance requirement cards for all of M1's phase maintenance activities. Despite knowledge of the issues involving Kapton wiring, the Navy did not specifically require the phase maintenance to include inspection for the Kapton wiring and fuel transfer issues which were determined to have caused the accident. Further, the Navy set the timeframes for the phase maintenance activities and performed its own quality assurance inspections.

Appellants' contention that "M1 had a duty to inspect and remediate the damaged wire bundle and fuel transfer tube that caused the on-board explosion and subject helicopter crash" calls into question the Navy's decision to not specifically include such inspection "because of funding considerations" until after this crash occurred. Just as the "Army's design decisions would be front and center at trial" in *K-9*, so too would the Navy's specifications on the phase maintenance cards as well as the Navy's decision to continue using helicopters with Kapton wiring. *Id.* at 258. And, like in *K-9*, the proportionate-liability defense requires the fact-finder to evaluate these decisions, as well as potential liability of the parties who settled in the parallel lawsuit in the United States District Court for the District of Connecticut. "[T]here is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor . . . and the military without evaluating the decisions made by each."

22

*Harris*, 724 F.3d at 474. Central to all of these inquiries is the Navy's decision to continue the use of Kapton wiring despite its knowledge of its many deficiencies.

While not identified as a separate issue, Appellants generally complain that "[t]he trial court incorrectly reasoned that because M1 could invoke the 'government-contractor defense,' this case was not justiciable." *See Boyle*, 487 U.S. at 529, 108 S. Ct. at 2528. They go on to argue that "[t]he application of the government-contractor defense is a key distinction between this case and [*K-9*], where *Boyle* did not apply." As Appellants note, *Boyle* permits a government contractor to avoid liability if it can prove that it complied with government specifications. *Id.* at 512, 108 S. Ct. at 2518. Specifically, the contractor must prove that "(1) the United States approved reasonably precise specifications, (2) the equipment conformed to those specifications, and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.*, 108 S. Ct. at 2518.

This government-contractor defense, also called the military-contractor defense, is a federal common-law defense based on the premise that liability claims arising from government procurement contracts could create a significant conflict between state tort law and the federal interest in immunizing the federal government from liability for performing a discretionary function. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 846 (Tex. 2000). Unlike the government-contractor defense, the political question doctrine deprives the court of subject matter jurisdiction because an

23

issue is committed to another branch of government and therefore outside the judiciary's authority to address. *K-9*, 556 S.W.3d at 253. The operation of the government-contractor defense is not concerned with the appropriateness of the government's specifications, only whether the contractor followed them. Although *K-9* did not involve a *Boyle* or government-contractor defense, it also did not limit itself to situations where the defense is inapplicable. Therefore, we do not do so here. Accordingly, we overrule Appellants' first issue.[10]

## 2. The trial court did not err by applying the political question doctrine to this case which occurred in a domestic setting.

First noting that "[t]he helicopter crash occurred near Virginia Beach, not Kabul or Baghdad," Appellants go on to argue that "this case occurred in a peacetime environment, not a combat zone" and "[c]oncerns about second-guessing strategic combat decisions are simply not present in this case." Citing a federal case, Appellants note that "the district court cases that have dismissed suits against private contractors on political question grounds all involved combat activities." *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1363 n.32 (11th Cir. 2007).

---

[10]While not assigned as a separate issue, Appellants argue that the trial court's broad interpretation of *K-9* will present "access to justice" issues for Texas residents. A similar argument was made in *K-9*. In response to Justice Devine's dissent arguing that the majority opinion "bars all tort suits where a military contractor—or any other defendant—is able to muster a mere allegation that a government actor whose decisions are insulated by the political[]question doctrine partly caused the alleged harm," the majority stated that "[t]his is simply not true." *K-9*, 556 S.W.3d at 260. "The political question doctrine is not always easy to apply, but it certainly cannot be invoked to bar all claims that merely happen to have a military setting." *Id.*

However, neither *K-9*'s language nor holding limits itself to war-time environments. Rather, *K-9* emphasized that the "*jurisdictional* issue is whether litigating the case inextricably involves reviewing military decisions." 556 S.W.3d at 260.

In addition, the Eleventh Circuit has expressly rejected Appellants' argument.

> The deeper problem with Carmichael's argument, however, is the implicit suggestion that a military decision is unreviewable only if it somehow pertains to battlefield or combat activities. While decisions relating to the latter issues are paradigmatically insulated from judicial review, it is neither necessary nor sufficient for purposes of the political question doctrine that military decisions relate to such matters.

*Carmichael*, 572 F.3d at 1287. *Carmichael* itself cited *Gilligan v. Morgan*, 413 U.S. 1, 93 S. Ct. 2440 (1973), where the Supreme Court held that the political question doctrine barred claims relating to the training, equipping, and control with respect to the domestic operations of the Ohio National Guard. *Gilligan*, 413 U.S. at 5–6, 93 S. Ct. at 2443–44; *see also Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C. Cir. 2006) (holding that the decision to establish a military base in a particular area presented a political question); *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (holding that claims for death and personal injury suffered during a NATO training exercise near Turkey present a "nonjusticiable political question").

We find no authority limiting *K-9*'s holding to combat zones. Therefore, we overrule Appellants' second issue.

25

### 3. The trial court did not construe the political question doctrine more broadly than *Baker*.

While Appellants' third issue complains generally that the trial court construed the political question doctrine set forth in *K-9* more broadly than the federal standard established in *Baker*, Appellants fail to explain how the trial court failed to adhere to *Baker*. *See Baker*, 369 U.S. at 217, 82 S. Ct. at 710. *K-9*'s analysis looked to *Baker* for the tests for identifying issues beyond the courts' power to decide. *K-9*, 556 S.W.3d at 252–53. So too did the trial court here.

Looking at the facts through the *Baker* lens, as was done in *K-9,* does not change the analysis. *See Baker*, 369 U.S. at 217, 82 S. Ct. at 710. "The issue in *Baker* was deeply political: whether states could apportion legislative districts with unequal numbers of voters." *K-9*, 556 S.W.3d at 253. As *K-9* discussed, the *Baker* court expanded on the political question doctrine by setting out six tests for identifying issues beyond the courts' power to decide. *Id.* at 252.

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political question already made; or [6] the

26

potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S. Ct. at 710. The first two issues were important to the *K-9* court. 556 S.W.3d at 252–53. However, the *K-9* court noted that "while we are guided in our view of the political question by *Marbury* and *Baker* as well as by other federal-court decisions, we apply the doctrine here as required for the separation of powers mandated by the Texas Constitution." *Id.* at 254.

Here, the trial court's findings of fact and conclusions of law closely followed the analysis laid out in *K-9*. None reached beyond the limits of *Baker*. Therefore, we overrule Appellants' third issue.

### 4. The trial court did not err by concluding that a jury could consider the Navy's fault under federal maritime law.

Finally, Appellants argue that "the trial court violated a bedrock maritime principle when it concluded that M1 would be permitted to allocate fault to the United States Navy, an immune party whom Appellants never sued or settled with." *See Feres v. United States*, 340 U.S. 135, 146, 71 S. Ct. 153, 159 (1950) (holding that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injury arises out of or are in the course of activities incident to service"). They go on to state that, "[u]nlike Texas law, maritime law follows joint and several liability" and under maritime law, fault cannot be allocated to immune third parties. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 210 n.10, 220–21, 114 S. Ct. 1461, 1466

27

n.10, 1471–72 (1994).[11]  As a result, Appellants contend, with only one exception, that third parties are not permitted on maritime jury forms because no allocation of fault is necessary.  *See Sands v. Kawasaki Motors Corp. USA*, 513 F. App'x 847, 855 (11th Cir. 2013) (responsible third party not allowed on jury form in jet ski accident case).  The one exception, Appellants note, is that a maritime defendant may receive a "credit" when a plaintiff settles with another party that is equal to the proportion of fault allocated to the settling party by a jury.  *Niche Oilfield Servs., LLC v. Carter*, 331 S.W.3d 563, 576 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

M1 responds that maritime law has consistently accommodated comparative responsibility principles notwithstanding the rule of joint and several liability.[12]  *See e.g., United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 1715–16 (1975) (holding "that when two or more parties have contributed by their fault to cause

---

[11]While Appellants argue that Texas Civil Practice and Remedies Code Section 33.003 is entirely preempted, we note that Chapter 33 is not concerned with the substantive defenses of responsible third parties.  Tex. Civ. Prac. & Rem. Code Ann. § 33.003; *Exxon Corp. v. Choo*, 881 S.W.2d 301, 304 (Tex. 1994) ("Texas recognizes that substantive federal maritime law has preemptive force over state law."); *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 869 (Tex. 2009).  "Thus, a defendant may designate a responsible third party even though that party possesses a defense to liability, or cannot be formally joined as a defendant, or both."  *Id.* at 868–69.  In addition, "a responsible third party may include persons who are not subject to the court's jurisdiction or who are immune from liability to the claimant."  *In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 58 n.5 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding).

[12]In addition, M1 notes that contributory negligence is also a defense to Appellants' claims under the Death on the High Seas Act.  *See* 46 U.S.C.A. § 30304.

property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault"). Also, it argues that maritime law permits the trier of fact to determine the responsibility of settling parties. *McDermott*, 511 U.S. at 219–20, 114 S. Ct. at 1470–71.[13]

*McDermott* settled the debate over the proper method of apportioning liability between settling and nonsettling tortfeasors in admiralty cases by holding that the proportionate share approach applies. *Sands*, 513 F. App'x at 855. Under that approach, if at least one defendant does not settle with the plaintiff, the amount of damages and percentage of liability attributable to each defendant is determined at trial. *Id.*

However, whether or not the Navy would be allowed on the jury form is not dispositive of the jurisdictional issue. In *McDermott*, the proportionate credit took into account the liability apportioned to a contractually immune party. 511 U.S. at 210 n.10, 114 S. Ct. at 1466 n.10. Under *McDermott*, the factfinder could also take into account the responsibility of the settling defendants—Sikorsky, GE, E.I. du Pont, and L-3—from the parallel Connecticut litigation. Appellants do not dispute M1's

---

[13]Appellants contend that "*McDermott* did not abrogate joint and several liability: it simply crafted a maritime settlement credit formula."

entitlement to submit consideration of the settling parties to the trial court.[14] Consideration of the fault of the settling defendants could also implicate assessment of the Navy's decisions in this case. *K-9* did not limit itself to situations where the military's responsibility was formally assessed. Therefore, even absent a formal allocation of fault to the Navy, its decisions in the determination of causation could be considered.

Appellants concede that the Navy's involvement could become an issue. At the hearing on the plea to the jurisdiction, Appellants' counsel stated, "I'm willing to concede that it's possible their experts will be able to cure the problem that I think they have, which is to say no evidence - - no testimony, no exhibit that gives them a recognized standard of care that has been violated to implicate the Navy. . . . They could have a Navy admiral come in here and say, 'Oh, yeah, that's our fault. We blew it.'"

Finally, the responsibility of the crewmembers might also be apportioned by the factfinder. As noted by M1, it was not ever required to marshal its proof on this issue; "[h]owever, if put to its proof, M1 could have shown, at a minimum, that the crewmembers made a pre-flight inspection that failed to discover the issue and that

_____

[14]At the hearing on the plea to the jurisdiction, Appellants' counsel stated, "There is a settlement setoff that they're entitled to. We - - make no bones about that. That's conceded."

30

they chose to continue the flight after a fire warning flickered[15] and after they were required to restart the cabin heater which cut off multiple times during the flight."[16]

Noting that this case was dismissed before expert disclosures were exchanged, Appellants argue that the allegations against the crewmembers have no factual basis and would require expert testimony. However, this sort of factual dispute is not front and center in the analysis. Rather, the *K-9* court emphasized that there must be a fact question regarding the *jurisdictional issue*, which is "whether litigating the case inextricably involves reviewing military decisions." 556 S.W.3d at 259–60.

Appellants complain that the trial court erred by admitting lay opinion testimony, the crash history of the MH-53E, and the Navy's subsequent remedial measures as evidence. With regard to the lay opinion testimony, they complain about the following statements contained in an email drafted by Appellant Van Dorn:

---

[15]In its "Findings of Fact," the Navy's investigative report states in part,

> While conducting towing operations, the fire warning light, which illuminates in the event of a fire, flickered briefly. As directed by LT Van Dorn, mishap Helicopter Aircraft Commander (HAC) [ ] visually inspected the #1 and #2 engines as well as the cabin heater via the port aft window. . . . Certain conditions of sunlight, especially during the early morning and late evening hours, may cause the engine or transmission fire warning lights to illuminate. The lights should extinguish when the helicopter changes its relative position to the sunlight. . . . As the sun was still low on the horizon, the crew determined the flicker of the fire light to be an erroneous indication.

[16]The Navy's investigative report noted that "while [the helicopter] was conducting its tow training, the cabin heater cut off multiple times throughout the training evolution."

31

- Since 2010, the Navy's variant, MH-53E, has crashed at a rate 10 times greater than any other helicopter in the Navy.

- The cause of [Lt. Van Dorn's] accident was not on any checklist prior to his flight.

Appellants contend that this lay opinion is inadmissible, not relevant, and not probative. They further argue that the post-crash changes made to the phase cards are inadmissible to prove the "culpable conduct" of the Navy and, in any event, are irrelevant. *See* Tex. R. Evid. 403, 407.

M1 responds that Appellants waived any error regarding the admissibility of this evidence because it failed to obtain a ruling on its objections. We agree.

To preserve a complaint for appellate review: (1) a party must complain to the trial court by way of a timely request, objection, or motion; and (2) the trial court must rule or refuse to rule on the request, objection, or motion. Tex. R. App. P. 33.1(a). In a summary judgment proceeding, a party asserting objections should obtain a written ruling at, before, or very near the time the trial court rules on the motion for summary judgment or risk waiver. *Cty. of El Paso v. Baker*, 579 S.W.3d 686, 694 (Tex. App.—El Paso 2019, no pet.). This same concept has been applied to pleas to the jurisdiction. *Id.* The record shows no ruling on any of Appellants' objections.

Even if not waived, the opinions by Appellant Van Dorn, the crash history, and the subsequent remedial measures do not raise a fact issue on the jurisdictional issue. Whether the Navy was actually responsible for the crash is not the issue faced by the trial court. As *K-9* held, "No one argues that the Army can be liable for Freeman's

32

injury. Rather, the [political question] doctrine protects against judicial reexamination of military decisions." 556 S.W.3d at 259. Therefore, we overrule Appellants' fourth issue.

## IV. CONCLUSION

Having overruled all four issues, we affirm the trial court's order granting the plea to the jurisdiction and dismissing the case.

/s/ Dana Womack

Dana Womack
Justice

Delivered: March 5, 2020