# Supreme Court of Texas

---

No. 20-0270

---

Nicole Van Dorn Preston, as Surviving Spouse and Personal
Representative for the Estate of Lt. J. Wesley Van Dorn, USN,
Deceased; Amy Snyder, as Surviving Spouse and Personal
Representative for the Estate of Lt. Sean Christopher Snyder,
USN, Deceased; Cheyenne Collins, as Surviving Spouse and
Personal Representative for the Estate of Petty Officer 3rd Class
Brian Andrew Collins, USN, Deceased; and Petty Officer 2nd
Class Dylan Morgan Boone, USN,

*Petitioners*,

v.

M1 Support Services, L.P.,

*Respondent*

---

On Petition for Review from the
Court of Appeals for the Second District of Texas

---

**Argued September 14, 2021**

JUSTICE BLAND delivered the opinion of the Court.

Justice Young did not participate in the decision.

In *American K-9 Detection Services v. Freeman*,[1] we recognized the political question doctrine in Texas state courts for cases involving the military. In adopting this separation of powers principle, we were careful to observe that state courts retain jurisdiction over "ordinary tort suits" capable of judicial management.[2] Abstention based on a political question thus requires a case-specific examination to determine whether judicial review of military action in a suit inappropriately encroaches on the Executive Branch's constitutional authority over the armed forces. In such circumstances, we do not allow judicial second-guessing.

In this case, a private contractor maintained a fleet of aging Navy helicopters. When one crashed during a training exercise, the families of the deceased servicemembers and a survivor sued the contractor, alleging claims under the Death on the High Seas Act and maritime law.[3] The trial court dismissed the suit for lack of subject-matter jurisdiction, ruling that questions of military judgment render this case nonjusticiable. The court of appeals affirmed.

Applying *American K-9's* principles, we conclude that the issues presented here are capable of judicial management without interfering with the military's judgment. Accordingly, we reverse and remand.

---

[1] 556 S.W.3d 246 (Tex. 2018). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).

[2] *Am. K-9,* 556 S.W.3d at 254.

[3] 46 U.S.C. § 30301, *et seq.*

# I

## A

In January 2014, a Navy MH-53E helicopter caught fire 100 feet above sea level and crashed into the Atlantic Ocean off the Virginia coast. Three aboard the aircraft—Lieutenant J. Wesley Van Dorn, Lieutenant Sean Snyder, and Petty Officer Third Class Brian Collins—died. Two others, including petitioner Petty Officer Second Class Dylan Boone, were injured.

The Navy recovered the wreckage. Upon inspection, its investigators discovered two holes in the helicopter's aluminum fuel-transfer tube and visible evidence of chafing damage surrounding the breached areas. The holes in the transfer tube would have allowed fuel to leak into the cabin of the aircraft. Investigators suspected that the same chafing exposed poorly insulated wiring, igniting the leaked fuel. Although it was not recovered, investigators further suspected that a wire bundle held together by a plastic zip-tie had rubbed against the fuel tube, causing the chafing damage.

Respondent M1 Support Services, L.P., a Texas-based private contractor, performed "phase maintenance" for the aircraft about three months before it crashed. Phase maintenance requires a top-to-bottom helicopter inspection and repair of any mechanical discrepancies. M1 completed the maintenance and marked the helicopter "safe for flight."

M1 performed its work according to a Navy-provided Performance Work Statement. The work statement required M1 to use "applicable publications, technical directives, instructions, standards, and

3

procedures contained in pertinent manuals," as well as Navy-provided "blueprints, drawings or schematics."

Through these directives—presented in a series of maintenance cards—the Navy prescribed the qualifications and number of M1 employees who were to perform the work and the time allotted to perform it. The Navy regularly inspected M1's activities, although the parties dispute whether these inspections involved more than a review of M1's paperwork. In one maintenance card directing M1's activities, the Navy expressly required that M1 check the "[f]uel and vent lines in [the helicopter's] cabin for leakage, chafing, obvious damage, and security."

**B**

Petty Officer Boone and the families of the deceased servicemen—the petitioners here—sued M1 for damages under the Death on the High Seas Act and general maritime law. The petitioners allege that M1 negligently failed to detect and repair damage to the fuel-transfer tube and the wire bundle during M1's phase maintenance, which in turn caused their injuries.

M1 denies the petitioners' allegations. It asserts several defenses, including the "proportionate responsibility of Plaintiffs and non-parties." M1 further asks that the trial court apply settlement proceeds obtained from other defendants as credits should the court render any judgment against it.[4]

---

[4] Four product-liability defendants resolved the petitioners' claims against them in the United States District Court for the District of Connecticut in December 2016 and January 2017.

When discovery was nearly complete, M1 moved for summary judgment, raising the government-contractor defense to liability that the Supreme Court recognized in *Boyle v. United Technologies Corp.*[5] The trial court never ruled on that motion. In the interim, M1 sought to dismiss this suit for lack of subject-matter jurisdiction, relying on our recent decision in *American K-9*. In its jurisdictional plea, M1 argued that the adjudication of this case is inextricable from judicial review of military decisions, raising the prospect of political interference of the sort that had made the claims in *American K-9* nonjusticiable.

In support of its plea, M1 adduced statements from naval officers who averred that the Navy commonly used spare parts obtained from inoperable aircraft for repairs on the helicopter fleet. One officer related an instance in which the Navy requested she maintain an aircraft without the proper technical manuals. And M1 observed that the command investigation recognized that the Navy had inspected the crashed helicopter before the accident and authorized it safe for flight. These complaints involve the Navy's maintenance procedures, M1 argued, and thus adjudicating the petitioners' claims would require the trial court to evaluate the Navy's decisions.

The petitioners responded that, unlike the questions presented in *American K-9*, this case simply involves the proper maintenance of a particular aircraft. The Navy required M1 to inspect and replace defective fuel lines, and M1 allegedly failed to do so in compliance with those requirements. These claims do not require second-guessing of the

---

[5] 487 U.S. 500, 512 (1998).

Navy's military judgment, the petitioners urged, but an analysis of whether M1 complied with the Navy's maintenance procedures. Any review of the Navy's actions in this case thus does not infringe on its strategic decision-making. In short, as we anticipated in *American K-9*, this case is an ordinary tort suit that is "subject to judicial review."[6]

The trial court granted M1's plea, concluding that this case would "inextricably involve a reexamination of professional Navy decisions beyond the Court's power to conduct" and would require "judicial second guessing" of the Navy's "procurement and maintenance" decisions. Such second-guessing, it ruled, runs counter to the political question doctrine we outlined in *American K-9*. The court of appeals largely adopted the trial court's reasoning, holding that the Navy maintained control over some of M1's operations.[7] We granted review.

## II

## A

Congress has the power to declare war and to raise and support the military, and the President is the Commander in Chief of the armed forces.[8] Even as the Supreme Court acknowledged the judiciary's power to determine whether actions of the political branches are lawful in *Marbury v. Madison*, it recognized the limits of this principle.[9] When the Executive Branch acts within its constitutional discretion, "nothing can be more perfectly clear than that their acts are only politically

---

[6] *Am. K-9*, 556 S.W.3d at 254, 257.

[7] 628 S.W.3d 300, 314 (Tex. App.—Fort Worth 2020).

[8] U.S. Const. art. I, § 8; art. II, § 2.

[9] 5 U.S. (1 Cranch) 137, 166, 177 (1803).

examinable."[10] Thus, as a matter of separation of federal power, the Judicial Branch has declined to review military action "intended by the Constitution to be left to the political branches directly responsible . . . to the electoral process."[11] The political question doctrine insulates decisions constitutionally committed to the other branches from judicial second-guessing.[12]

The Supreme Court examined the contours of the federal political question doctrine in *Baker v. Carr*.[13] In rejecting the argument that the congressional apportionment issues in that case presented political questions, the Court listed factors that may indicate one exists.[14] Chief among them are whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political

---

[10] *Id.* at 166 ("The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.").

[11] *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (holding that appellate court's prospective injunctive relief against Ohio National Guard "failed to give appropriate weight to [the] separation of powers" and was nonjusticiable as framed).

[12] *Japan Whaling Ass'n*, 478 U.S. at 230 ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.").

[13] 369 U.S. 186 (1962).

[14] *Id.* at 217. As we have observed, "[t]he Court did not hold the one-man-one-vote congressional apportionment issue in *Baker v. Carr* to be a political question, and it has refused to hold issues to be political questions in at least seven other cases." *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 779 (Tex. 2005) (collecting cases).

department" or "a lack of judicially discoverable and manageable standards for resolving it":

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[15]

While we have never determined whether the *Baker* factors apply in Texas courts, the Texas Constitution expressly enshrines the separation of powers as a fundamental principle of limited government.[16] Accordingly, under our own Constitution, Texas state courts decline to exercise jurisdiction over questions committed to the executive and legislative branches.[17]

---

[15] *Baker*, 369 U.S. at 217.

[16] *See* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments . . . and no person, or collection of persons . . . shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."); *see also Neeley*, 176 S.W.3d at 780 (assuming without deciding that the *Baker* factors apply under the Texas Constitution).

[17] *See Neeley*, 176 S.W.3d at 778 (concerning authority delegated to the Texas Legislature); *Am. K-9*, 556 S.W.3d at 254 (concerning authority delegated to the federal Executive Branch).

In *American K-9*, we considered the power of the Texas judiciary to adjudicate cases in which state court claims intersect with federal legislative and executive power. We applied the Texas Constitution's separation of powers principles to determine whether jurisdiction existed, "guided in our view of the political question doctrine by *Marbury* and *Baker* as well as by other federal-court decisions."[18] This case presents a similar state–federal dynamic. The claims presented are ones over which the federal courts have concurrent jurisdiction, and we apply *American K-9*'s analysis, guided by federal precedent, to inform our decision.[19]

**B**

The political question doctrine is an issue of subject-matter jurisdiction, and thus a party properly asserts it in Texas state court via a plea to the jurisdiction.[20] Whether the jurisdictional facts establish trial-court jurisdiction is a question of law that we review de novo.[21] Though a trial court submits to the factfinder disputed jurisdictional fact issues intertwined with the merits, a trial court must resolve at the

---

[18] *Am. K-9*, 556 S.W.3d at 254.

[19] *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 232 (1986) (observing that state and federal courts share concurrent jurisdiction over Death on the High Seas Act claims); *Madruga v. Super. Ct.*, 346 U.S. 556, 561 (1954) (observing that state and federal courts share concurrent jurisdiction over maritime-law claims).

[20] *Am. K-9*, 556 S.W.3d at 259–60; *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

[21] *Am. K-9*, 556 S.W.3d at 267.

outset jurisdictional fact disputes that arise independently from the merits of the claim.[22]

The petitioners contend that the trial court acted prematurely in granting M1's jurisdictional plea because M1 relies on some disputed facts—namely, whether the Navy bears responsibility for the accident—that are intertwined with the merits. M1 responds that the actual resolution of these disputed facts is immaterial to the jurisdictional analysis—it is the need to resolve them at all that implicates the political question doctrine.

We agree with M1. The question is not the degree to which a jury could find the Navy culpable for the crash. The question instead is the degree to which adjudication of the claims against M1 requires an examination of military decisions that are constitutionally insulated from judicial review. To discern whether a nonjusticiable political question exists, we consider the case "as it would be tried,"[23] including all the claims and defenses supported by jurisdictional facts.[24]

That a political question exists may appear on the face of the pleadings. In such a case, the proponent of the doctrine need not adduce evidence to support a jurisdictional plea. In other circumstances, however, the pleadings alone will not establish the merit of such a plea.

---

[22] *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015); *Miranda*, 133 S.W.3d at 226; *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018).

[23] *Am. K-9*, 556 S.W.3d at 255 (quoting *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1202 (5th Cir. 1978)).

[24] *Id.* at 256.

If the issue is whether the military exercised plenary control over a private contractor, for instance, or whether a contractor is entitled to a defense that implicates a political question, then the pleadings may not establish on their face that the case is nonjusticiable. When that is so, private contractors cannot rely on bare allegations to avoid suit. Rather, they must adduce evidence to support their contention that their defenses necessarily implicate nonjusticiable political questions.[25] Determination of the existence of a political question requires a "discriminating inquiry into the precise facts and posture" of the case.[26]

As we said in *American K-9*, "[t]he inextricable involvement of military decisions in this case is *not a matter of fact but a matter of law*."[27] Whether a trial court must abstain in accord with the political question doctrine does not depend on the outcome of the case—it instead depends on the degree of intrusion into military decision-making the jurisdictional facts present, regardless of that outcome.

### III

To examine whether judicial intrusion rises to a level of constitutional concern, we ask first, the degree to which the case requires a review of military decisions, and second, whether such a

---

[25] *See Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 477 (3d Cir. 2013) (holding that military-contractor defendant must show evidence of servicemember's negligence to support that its negligence defense implicates political question).

[26] *Baker*, 369 U.S. at 217.

[27] 556 S.W.3d at 259 (emphasis added).

review interferes with constitutionally protected questions of military strategy and judgment.[28]

## A

Private military contractors are not political branches.[29] Control of the armed forces who hire them, however, is committed to the President of the United States, the head of the Executive Branch.[30] Given this relationship, the first consideration in a case against a private contractor is the degree to which adjudicating claims against it requires examination of military decision-making at all.[31] When the military controls the contractor's decisions, they may become "de facto military decisions,"[32] such that any evaluation of the contractor's activity necessarily involves review of the military's orders directing that activity.[33]

Thus, in *American K-9*, we concluded that the military exercised control over a private contractor responsible for securing its specially trained dogs deployed in a war zone.[34] When one of the contractor's dogs

---

[28] *See generally id.* at 255–57.

[29] *Harris*, 724 F.3d at 465 ("Defense contractors do not have independent constitutional authority and are not coordinate branches of government to which we owe deference.").

[30] U.S. Const. art. II, § 2.

[31] *Am. K-9*, 556 S.W.3d at 255.

[32] *Id.*; *Harris*, 724 F.3d at 466 ("Military control requires evaluation of military decisions because if the contractor is simply doing what the military ordered it to do, then review of the contractor's actions necessarily includes review of the military order directing the action.").

[33] *Harris*, 724 F.3d at 466.

[34] 556 S.W.3d at 250–51.

escaped its kennel and "jumped up against" a civilian, she sued.[35] In concluding that the case presented a political question, we held that "[t]he military had plenary control over at least some of the decisions implicated by [the civilian's] claim."[36] The Army had designed the kennels and constructed internal partitions at a height that allowed the dog to vault them. The contractor adduced evidence that the Army required the contractor to house its dogs in these kennels.[37]

Federal courts similarly have held that military control over the details of the contractor's work may implicate military decisions. In *Carmichael v. Kellogg, Brown & Root Services,* the Eleventh Circuit concluded that the military exercised plenary control over private-contractor drivers who were part of a "heavily militarized" Army convoy through a war zone in Iraq.[38] In that case, the contractor adduced evidence that the Army controlled the convoy's date and time of departure, number of vehicles, route, speed, supplies, and attendant security measures.[39]

The Third Circuit in *Harris v. Kellogg Brown & Root Services*, in contrast, held that a wrongful death suit brought by a servicemember's parents against an electrical contractor was justiciable.[40] The contractor allegedly failed to properly ground a water pump at military housing in

---

[35] *Id.* at 251.

[36] *Id.* at 258.

[37] *Id.*

[38] 572 F.3d 1271, 1276 (11th Cir. 2009).

[39] *Id.* at 1276–77.

[40] *Harris*, 724 F.3d at 467.

Iraq, and the servicemember died while taking a shower.[41] The court cited the contract's delegation of "significant discretion" to the contractor and the "lack of military involvement in completing authorized work orders."[42]

In this case, the petitioners allege that M1's maintenance deviated from the Navy's direction: "At all relevant times, M1 had a duty to inspect and remediate the damaged wire bundle and fuel transfer tube." In particular, master phase card M-12 required M1 to inspect "[f]uel and vent lines in [the] cabin for leakage, chafing, obvious damage, and security." The petitioners do not allege that the Navy's instructions were deficient. The petitioners' allegations do not implicate military strategy or judgment on their face.

M1 responds, first, that the Navy exercised control over its operations. Second, it argues that the Navy is independently responsible for the crash. The trial court agreed, finding that the "Navy had a substantial role in M1's phase maintenance" on the helicopter, including issuing the performance work statement, which contained the phase/maintenance cards. It also found that "the Navy performed some quality control functions" by "reviewing M1's maintenance paperwork, performing spot-checks, and/or performing foreign object damage inspections (including Kapton wiring discrepancies)."

The jurisdictional evidence does not support the conclusion that the Navy denied M1 discretion in performing maintenance on the

---

[41] *Id.* at 463.

[42] *Id.* at 467.

helicopter. The Navy instructed M1 to inspect "[f]uel and vent lines in [the helicopter's] cabin for leakage, chafing, obvious damage, and security," but left M1 discretion in carrying out the inspection. The petitioners allege that M1 performed the inspection negligently, pointing out that one of M1's maintenance workers noticed the zip-tied bundle of wires and failed to remove it because he did not think that plastic zip-ties could cause chafing damage to a fuel tube. The maintenance work was left to M1, and the allegation is that M1 did not properly perform it.

The Navy's investigators attributed the helicopter crash to defects in the aircraft's wiring and fuel tube, and M1 has offered no alternative cause at this stage. M1 and the trial court identified "staffing requirements," the Navy's "detailed instructions for each maintenance activity," the Navy's control over the maintenance schedule, and the Navy's acceptance of the aircraft as issues involving military control. But M1 does not connect the Navy's inspection, staffing, or scheduling requirements to M1's alleged failure to perform its tasks or to removal of its own discretion in performing them. The Navy's inspection and acceptance of M1's work does not transmute M1's maintenance actions into the Navy's actions. The jurisdictional plea alleges, but does not support with evidence, a connection between naval control over M1 and the crash.

In *American K-9*, in contrast, the evidence showed that the Army designed and constructed the kennel that permitted the dog to escape in a war zone, and questions of its construction implicated strategic

military planning.[43] As a result, we held, "a court should not insert itself into determining whether the Army should or should not have followed its guidelines."[44] In contrast, the Navy's control over M1's operations left discretion to M1 in performing the required maintenance on the aircraft pursuant to the Navy's directives, and in determining that the aircraft was safe for flight.[45]

## B

Even if the Navy did not control M1's maintenance operations, M1 argues, the Navy was partially or wholly responsible for the accident, calling the Navy's judgment into question. The second aspect of our *American K-9* analysis examines whether the military decisions under scrutiny are of the type that are "insulated from judicial review."[46] As we observed in *American K-9*, a contractor's causation defense may raise political questions that render a suit against it nonjusticiable.[47]

In its pleadings, M1 offers the Navy's negligence as a cause of the crash. It observes that "the Navy performed its own maintenance on the

---

[43] 556 S.W.3d at 258–59.

[44] *Id.* at 258.

[45] *See Harris*, 724 F.3d at 467 ("[W]here the military does not exercise control but merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions.").

[46] 556 S.W.3d at 257 (quoting *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1360 (11th Cir. 2007)). The federal courts look to the factors listed in *Baker v. Carr*, 369 U.S. 186 (1962), to determine whether a military decision is insulated from review. *E.g., Harris*, 724 F.3d 458 (applying the *Baker* factors to determine whether the case is justiciable); *Carmichael*, 572 F.3d 1271 (same).

[47] 556 S.W.3d at 256.

16

helicopter both before and after M1's maintenance," and it attached the petitioners' general criticisms of the Navy's maintenance practices. To demonstrate a political question, however, it is not enough that M1 alleges these defenses; it must provide evidence of a connection between these military actions and the crash as part of its plea to the jurisdiction. M1 does not suggest, for example, that the Navy provided M1 with a defective spare part. M1 and the record it produced do not connect general criticisms regarding cannibalized parts or the lack of an appropriate technical manual to a failure to detect the fuel-tube damage or to the crash of this aircraft.

The central issue in this case is the maintenance of a particular aircraft and whether deficiencies in its maintenance contributed to a crash. To the extent that the Navy's inspections are implicated, we are not convinced that its maintenance work on this particular helicopter is insulated from judicial review. The federal government-contractor defense the Supreme Court recognized in *Boyle v. United Technologies Corp.* indicates it is not.[48]

Like this case, *Boyle* concerned a helicopter crash during a military training exercise. The *Boyle* plaintiff sued the helicopter's manufacturer under state tort law, alleging the manufacturer defectively designed the helicopter's emergency escape system. The Supreme Court held that the Federal Tort Claims Act's exception for liability for the discretionary acts of government officials displaced state tort law, but only in circumstances in which the contractor could not

---

[48] *See* 487 U.S. at 511–12.

comply with both its contractual obligations to the federal government and with relevant state tort law.[49] The Court left intact state-prescribed duties of care that presented no conflict:

> If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.[50]

Under *Boyle*, a government contractor can avoid tort liability when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[51] *Boyle* does not foreclose liability when the contractor acts outside the specifications approved by the government or fails to conform to those specifications.[52] Rather, in limiting liability but not justiciability, the

---

[49] *Id.* at 509.

[50] *Id.*

[51] *Id.* at 512.

[52] *E.g.*, *McGonigal v. Gearhart Indus.*, 851 F.2d 774, 777 (5th Cir. 1988) (declining to extend *Boyle* to manufacturing defect claims); *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989) (holding that government's "rubber stamp" of design plans did not constitute approval of specifications; thus concluding *Boyle* defense did not apply).

18

Court assumed that some cases that implicate military actions do not present political questions.[53]

M1 responds that, like *American K-9*, this case involves the equipping of the military, which is "constitutionally committed to the federal political branches."[54] It was the Navy's decision to use an older helicopter with poorly insulated wiring as part of its training fleet that caused the crash, M1 says, and this decision implicates the Navy's strategic judgment. It likens these actions to the Army's actions in housing canine troops in a war zone, which, we noted, require the "specific exercise of *military* expertise and judgment."[55]

The central question in this case, however, is not about equipping—whether the Navy deployed the right helicopter. The question instead is whether M1 or the Navy failed to detect and repair this helicopter in compliance with Navy maintenance guidelines, causing it to be unsafe for flight. Both Texas and federal courts have successfully adjudicated product liability and negligence cases against private-contractor defendants who have provided goods or services to the military.[56]

---

[53] We express no opinion on whether *Boyle* applies to this case.

[54] *See* 556 S.W.3d at 258.

[55] *Carmichael*, 572 F.3d at 1282.

[56] *See, e.g., Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000); *Augustine v. Bell Helicopter Textron*, 922 S.W.2d 287 (Tex. App.—Fort Worth 1996, writ denied); *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993); *Skyline Air Serv. v. G.L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990).

These questions require mechanical, not military, expertise—of the kind our Court addressed in *Torrington Co. v. Stutzman*.[57] In *Torrington*, the survivors of two servicemembers who died in a Navy helicopter crash sued the helicopter's bearings manufacturer for negligence and product liability, alleging that defective bearings caused the crash.[58] The Navy inspected the helicopter four months before the crash and noted the presence of the bearings, but it did not replace them. In rejecting the contractor's defense based on the Navy's involvement, we never alluded to a jurisdictional infirmity.[59]

An inquiry into a contractor's compliance with military instructions does not force the judiciary to decide whether the military's allocation of resources was reasonable. Texas has no established standards for resolving disputes over battlefield military housing decisions, or over the reasonableness of military aircraft maintenance schedules, but we possess manageable standards for deciding whether a private contractor complied with an individual helicopter's maintenance plan—even if the Navy created that maintenance plan. As the Eleventh Circuit noted in rejecting the doctrine's applicability in another plane-crash case, "[i]t is well within the competence of a federal court to apply negligence standards to a plane crash."[60] It is within the competence of state courts to do the same.

---

[57] 46 S.W.3d at 833–35.

[58] *Id.*

[59] *Id.*

[60] *McMahon*, 502 F.3d at 1364.

We agree that issues that implicate sensitive military decision-making are nonjusticiable. M1 has adduced no jurisdictional facts, however, demonstrating that the crew was negligent in piloting the aircraft or was responding to a military exigency, or that the conduct of the training exercise played a role in causing the crash.[61] In its plea to the jurisdiction, M1 points to evidence that the Navy strategically cannibalized parts from inoperable aircraft to save money, and that the Navy on at least one occasion told a maintenance officer to service an aircraft without the appropriate technical manuals. However, M1 does not connect these actions to this crash, which investigators concluded resulted from chafing damage to wiring and a fuel tube. The Navy action identified in the plea to the jurisdiction and supported by some evidence is the Navy's inspection and maintenance of this helicopter. To the extent that this case implicates the Navy's potentially faulty inspection and maintenance of this particular aircraft—as opposed to its decisions about aircraft maintenance generally—judicial examination of those actions does not intrude into a military prerogative committed to the Executive Branch.

---

[61] M1 has asserted that the crew members were responsible for the accident but did not adduce facts to support its assertion. In *American K-9*, in contrast, we noted the evidence the contractor adduced from its project manager that the Army's strategic battlefield decisions played a role in causing the plaintiff's injury to support its jurisdictional plea. 556 S.W.3d at 251, 258. Similarly, M1 adduced no facts demonstrating that assessment of the settling parties' actions implicates strategic military considerations. The federal court suit against these settling defendants belies the contention that evaluation of these claims renders this case nonjusticiable.

The Navy is immune from suit in this case and cannot be held liable.[62] M1 contends, however, that the Navy is proportionately responsible for the petitioners' claims against it, and it further contends that a jury must determine the extent of the Navy's responsibility, essentially putting the Navy on trial.[63] We agree that the claims in this case implicate the Navy's actions in maintaining the downed helicopter, regardless of whether the trial court submits it as a responsible party. But the Navy actions M1 identified in its plea to the jurisdiction and supported with evidence are ones capable of review under ordinary judicial standards. Nothing about the Navy's actions in this case necessitates an examination of specific "*military* expertise and

---

[62] Unlike cases in which the plaintiffs seek to hold the military directly liable, raising the prospect of direct interference with military management, the parties agree that the Navy cannot be held liable in this case. *See, e.g.*, *Gilligan*, 413 U.S. at 10; *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997); *Tiffany v. United States*, 931 F.2d 271 (4th Cir. 1991). The *Feres* doctrine bars any suit against the Navy in these circumstances. *Feres v. United States*, 340 U.S. 135, 146 (1950) ("We conclude that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.").

[63] The petitioners respond that the law does not permit the trial court to submit the Navy's responsibility to the jury. The Supreme Court, however, has recognized that a trier of fact may determine the liability of settling parties to allow for proportionate responsibility in maritime cases. *See McDermott v. AmClyde*, 511 U.S. 202, 204 (1994). The petitioners distinguish *McDermott*, arguing that maritime law does not permit a factfinder to assess responsibility against a non-settling but immune third party—such as the Navy—and thus the Navy's responsibility cannot appear on a jury verdict form. *See Hausman v. Holland Am. Line-USA,* No. 13-cv-00937, 2015 WL 11234150, at *3–*4 (W.D. Wash. June 3, 2015). M1 responds that a party's immunity constitutes "pre-settlement" of liability and thus a court may submit its responsibility to the trier of fact under *McDermott*. We express no opinion on the merit of these arguments.

judgment."[64] For these reasons, we conclude that the claims about the maintenance of this aircraft—by M1 and the Navy—are justiciable.

The Navy produced its investigation materials, and it has cooperated with discovery. The Navy presented its Quality Assurance Representative for a deposition. The Navy thus has provided the relevant witnesses and discovery that, if unavailable, might deprive a private contractor of a fair trial. A private contractor must be able to properly defend itself at trial when it adduces facts demonstrating that the military's conduct caused the claimed injury. Such a consideration should weigh heavily in a justiciability analysis.[65] Here, however, there is no showing that the contractor is hampered in presenting its case.

We excluded cases like this one from the political question doctrine in *American K-9*. "Ordinary tort suits," we said, are not unquestionably committed to the political branches—even when "touching on military matters."[66] When the military's actions do not involve military expertise or judgment, and judicial history demonstrates the existence of "judicially discoverable and manageable standards," a state court should not abstain from exercising its constitutional jurisdiction to resolve the dispute.[67]

\* \* \*

---

[64] *Carmichael*, 572 F.3d at 1282.

[65] The federal courts recognize a rarely invoked doctrine called the state-secrets privilege, for example. *See United States v. Reynolds*, 345 U.S. 1 (1953).

[66] *Am. K-9*, 556 S.W.3d at 254.

[67] *Baker*, 369 U.S. at 217. None of the remaining *Baker* factors are present here.

We hold that the political question doctrine does not deprive the state courts of jurisdiction over this case. Accordingly, we reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

Jane N. Bland
Justice

**OPINION DELIVERED:** January 21, 2022